[Cite as *O'Malley v. O'Malley*, 2013-Ohio-5238.]

# Court of Appeals of Ohio

EIGHTH APPELLATE DISTRICT
COUNTY OF CUYAHOGA

JOURNAL ENTRY AND OPINION
**No. 98708**

## VICKI M. O'MALLEY

PLAINTIFF-APPELLANT

vs.

## PATRICK J. O'MALLEY

DEFENDANT-APPELLEE

**JUDGMENT:**
AFFIRMED

Civil Appeal from the
Cuyahoga County Court of Common Pleas
Domestic Relations Division
Case No. D-299141

**BEFORE:** E.T. Gallagher, J., Stewart, A.J., and Keough, J.

**RELEASED AND JOURNALIZED:** November 27, 2013

**ATTORNEYS FOR APPELLANT**

Brian S. Schick
1516 Sunview Road
Lyndhurst, Ohio 44124

Michael A. Partlow
112 South Water St., Suite C
Kent, Ohio 44240


**ATTORNEYS FOR DOMESTIC VIOLENCE LEGAL EMPOWERMENT AND APPEALS PROJECT**

Christopher Marcinko
430 Fremont Road
Port Clinton, Ohio 43452

Nomi Berenson
Jessica Davis
Goodwin Procter LLP
The New York Times Bldg.
620 Eighth Avenue
New York, New York 10018


**ATTORNEYS FOR APPELLEE**

Margaret M. Metzinger
John R. Climaco
David M. Cuppage
Climaco, Wilcox, Peca, Tarantino & Garafoli
55 Public Square, Suite 1950
Cleveland, Ohio 44113


**ATTORNEY FOR GUARDIAN AD LITEM**

Adam J. Thurman
Schoonover, Rosenthal, Thurman & Daray, L.L.C.
1001 Lakeside Avenue, Suite 1720

Cleveland, Ohio 44114

EILEEN T. GALLAGHER, J.:

{¶1} Plaintiff-appellant, Vicki M. O'Malley ("Mother") appeals the trial court's judgment designating Patrick J. O'Malley ("Father") as the residential parent and legal custodian of the parties' minor children. We find no merit to the appeal and affirm.

{¶2} Mother and Father were married in April 2000, separated in February 2003, and were divorced in February 2006. They had two children as issue of the marriage; ("P.O.") born in 2001, and ("C.O.") born in 2002. During the divorce proceedings, the court appointed Dr. Sandra McPherson ("Dr. McPherson"), a psychologist, as guardian ad litem for the children. Much of the divorce litigation involved controversy over the allocation of parental rights and responsibilities. The parties ultimately reached a settlement agreement, and the trial court filed an agreed judgment entry of divorce incorporating the parties' shared parenting plan in February 2006.

{¶3} The parties initially cooperated with each other in implementing the shared parenting plan. Father traveled with the children and they spent long periods of time in his home. However, in 2008 the parties' relationship deteriorated, and Father was indicted and sentenced to federal prison for 15 months on an obscenity charge.

{¶4} Mother initiated this post-decree litigation in October 2008. She filed a motion to modify the allocation of parental rights and responsibilities and/or to terminate the shared parenting plan. The court appointed Mother the temporary residential parent and legal custodian while Father was in federal prison, and Father resumed visitation after his release.

**{¶5}** During the pendency of the post-decree litigation, that lasted almost four years, the trial court reappointed Dr. McPherson as the children's guardian ad litem. Throughout the litigation, Mother alleged Father had physically and mentally abused the children. Father alleged Mother had programmed the children to fear and dislike him. Following the trial that concluded in February 2012, the court issued an interim order dated April 12, 2012 (the "Interim Order"), in which the trial court stated that it found that Mother "used all means available to her to intimidate and discredit [Father], and she has interfered with his having a relationship with the children." The court also found Mother's accusations that Father was abusive were not supported by the evidence and that Mother "failed to inform or engage Father in their children's school, physical health, or mental health counseling, and she ha[d] taken no responsibility toward modifying their children's negative behavior when they were with Father."

**{¶6}** With respect to Father, the court found he "spent minimal time with the children the past two and half years." After he completed his sentence and resumed limited parenting time, "on two occasions he chose to stay away from his children for extended periods of time because the children challenged his parenting skills." Several witnesses who testified at trial described a dramatic change in the children's behavior after Father began serving his sentence. Father's sister, the children's aunt, and Father's oldest son from a prior marriage, testified that at family gatherings, the children stated: "You are not my family," and "Mom hates you." Father's girlfriend testified that after 2008, the children became "vicious and hateful."

{¶7} The children's behavior worsened over time. They refused to eat or talk during visits. P.O. punched and kicked their aunt. Father's girlfriend testified that she observed the children trying to hit Father in the head with a boot. At a birthday party in January 2011, P.O. told his grandmother, "I hate you, I hate all the O'Malleys." Both the children declared: "We are not O'Malleys." P.O. threw oranges at Father and pulled an aerosol can from his backpack and sprayed him. When Father moved to restrain P.O., C.O. jumped on his back while P.O. kicked Father. The children were screaming and crying. According to Father's girlfriend, the adults were "shocked" and "dumbfounded." The entire episode was videotaped and someone called the police, who interviewed the children and viewed the videotape. A police officer reprimanded the children for lying regarding the incident, told them they assaulted their father, and ordered them to apologize.

{¶8} In the trial court's Interim Order, the court found:

These children are "out of control" and their emotional, mental, and physical health has been adversely affected by both parents' unreasonable attitudes and behavior during the present litigation. Both parents have positive assets. Their primary liability is that they have failed to take personal responsibility for their children's problems. They do not communicate or do a reality check regarding their children. This is why this court is ordering family therapy before making major modification to the terms of their shared parenting plan ("SPP").

{¶9} The Interim Order required the parties: (1) work with Western Reserve Psychological Associates to establish ground rules for their children with therapeutic

intervention for both parents and their children, (2) submit their suggestions for modifying the shared parenting plan, and (3) submit proposals for a parent coordinator. The order also scheduled a status conference for May 23, 2012, to review the parties' progress regarding reunification.

{¶10} Neither party complied with the court's Interim Order. On May 16, 2012, Mother filed a writ of mandamus, seeking a final judgment on her motion to terminate the shared parenting plan, and a writ of prohibition to prohibit the judge from holding any further hearings until the judge issued her final ruling. This court dismissed both writs. *State ex rel. O'Malley v. Nicely*, 8th Dist. Cuyahoga No. 98368, 2012-Ohio-4405. On May 23, 2012, Father filed a motion to reconsider the Interim Order.

{¶11} In its final judgment, the trial court did reconsider its Interim Order and found "that it would be in the best interest of these children to terminate the parties' [shared parenting plan] and reallocate the parental rights and responsibilities to Father who will be the residential parent and legal custodian of the children." The order further stated that Mother's "parenting time would not begin until the therapist has determined the children have successfully made the transition to Father's home." Mother now appeals and raises eleven assignments of error.[1]

**Evidence Outside of Trial**

---

[1] Action Ohio Coalition for Battered Women, Ohio Now Education and Legal Fund, Professor Mike Briger, J.D., and Domestic Violence Legal Empowerment and Appeals Project filed an Amici Curiae brief. However, we find the Amici brief is not informative for purposes of this appeal.

**{¶12}** In the first assignment of error, Mother argues the trial court violated her right to due process and committed a structural error by relying on evidence outside the scope of the trial in rendering its final judgment. She contends the trial court originally found that retaining the shared parenting plan, with modifications, was in the best interest of the children in its Interim Order and improperly changed its best interest determination in its final judgment dated July 20, 2012, without hearing any additional sworn testimony. She also contends this change constituted plain error.

**{¶13}** "Structural errors" are a category of fundamental constitutional errors that "are so intrinsically harmful as to require automatic reversal * * * without regard to their effect on the outcome." *Neder v. United States*, 527 U.S. 1, 7, 119 S.Ct. 1827, 144 L.Ed.2d 35 (1999). They are predominately applicable to the rights of a defendant in a criminal trial. *Striff v. Luke Med. Practitioners, Inc.*, 3d Dist. Allen No. 1-10-15, 2010-Ohio-6261, fn. 2. *See, e.g.*, *State v. Colon*, 118 Ohio St.3d 26, 2008-Ohio-1624, 885 N.E.2d 917 (the omission of a mens rea allegation in the indictment was a structural defect that rendered the conviction improper);[2] *Gideon v. Wainwright*, 372 U.S. 335, 83 S.Ct. 792, 9 L.Ed.2d 799 (1963) (the defendant was completely denied counsel); *Vasquez v. Hillery*, 474 U.S. 254, 106 S.Ct. 617, 88 L.Ed.2d 598 (1986) (racial discrimination took place in grand jury selection); *Waller v. Georgia*, 467 U.S. 39, 104 S.Ct. 2210, 81 L.Ed.2d 31 (1984) (the defendant was denied a public trial).

---

[2] *Colon* was later overruled by *State v. Horner*, 126 Ohio St.3d 466, 2010-Ohio-3830, 935 N.E.2d 26 (a defendant's failure to make a timely objection to a defect in an indictment constitutes waiver of all but plain error).

{¶14} Even in criminal prosecutions, where constitutional rights to life and liberty are at stake, the United States Supreme Court has made clear that situations involving structural error requiring automatic reversal are a "very limited class of cases." *Johnson v. United States*, 520 U.S. 461, 468, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997). Structural errors are the "exception and not the rule," *Id.*, quoting *Rose v. Clark*, 478 U.S. 570, 578, 106 S.Ct. 3101, 92 L.Ed.2d 460 (1986), and most constitutional errors are harmless. *Arizona v. Fulminante*, 499 U.S. 279, 306, 111 S.Ct. 1246, 113 L.Ed.2d 302 (1991).

{¶15} A parent's right to the custody of her child is a fundamental liberty interest protected by due process. *Troxel v. Granville*, 530 U.S. 57, 65-66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *In re Adoption of Walters*, 112 Ohio St.3d 315, 2007-Ohio-7, 859 N.E.2d 545, ¶ 18. The Due Process Clause of the Fifth Amendment to the United States Constitution, as applicable to the states through the Fourteenth Amendment, provides: "No person shall * * * be deprived of life, liberty, or property, without due process of law." Therefore, a court may not deprive a parent of her right to custody of her child without due process of law.

{¶16} Due process requires both notice and an opportunity to be heard. *In re Thompkins*, 115 Ohio St.3d 409, 2007-Ohio-5238, 875 N.E.2d 582, ¶ 13. "An elementary and fundamental requirement of due process in any proceeding which is to be accorded finality is notice reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their

objections." *Id.*, quoting *Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 70 S.Ct. 652, 94 L.Ed. 865 (1950).

{¶17} In its Interim Order, the trial court concluded it was in the children's best interest that they have a meaningful relationship with their father, and the order was designed to implement reunification through family therapy. The court concluded reunification therapy was necessary because from 2008, when Mother filed the motion to modify, until the time of trial, Mother "failed to inform or engage Father in their children's school, physical health, or mental health counseling, and she has taken no responsibility toward modifying their children's negative behavior when they are with Father." The court also found that the children's negative feelings and beliefs about their father were "significantly disproportionate to" their "actual past experiences" with him and that their misperceptions and negative beliefs hindered their ability to have a positive relationship.

{¶18} The Interim Order clearly indicates the court would hold a status conference to assess the parties' progress toward reunification. Further, it is undisputed that both Mother and her counsel were present at the May 23, 2012 status conference. Therefore, Mother had notice and an opportunity to be heard. The fact that the trial court did not hear any sworn testimony does not diminish the impact on Mother's already fulfilled due process rights. *In re J.M.*, 12th Dist. Warren No. CA2008-01-004, 2008-Ohio-6763, ¶ 26.[3]

---

[3] In *In re J.M.*, the court affirmed a judgment holding a father in contempt for failing to pay therapy fees for his children in violation of an interim order without sworn testimony. In affirming the contempt order, the

**{¶19}** At the May 23, 2012 status conference, the court asked the parties, on the record, to discuss the status of the reunification therapy. Mother admitted to the court that she refused to participate in family therapy, claiming the therapists told her they had been instructed to provide reports on the therapy to the court. During the discussion, the court stated:

> My Interim Order was to make the transition of these children and their relationship with their father an easier transition; and so I felt that a therapist was needed, was in need of purely family intervention to help the process because father spent very little time with the children.

Mother, through counsel, would not agree to provide testimonial immunity to the therapists, expressing her desire to reserve the right to call them as witnesses at a future proceeding. The court concluded that without testimonial immunity, therapy would be impossible. Thus, at the conclusion of the May 23, 2012 status conference, the court found itself in the same position it was in at the conclusion of the trial, and it was evident no progress would be made under the current shared parenting arrangement.

**{¶20}** The court's final order was not based on Mother's admitted failure to comply with the Interim Order. It was based on almost four years of proceedings, including 15 days of trial, which included the testimony of 24 witnesses. Indeed, nothing had changed between the time the trial concluded and the court's final judgment. In its Interim Order,

---

appellate court found no due process violation because the father had notice that the court scheduled the pretrial to determine whether father paid the fees in compliance with the court's earlier order and his counsel, who was present at the pretrial, admitted that he had not. *Id*. at ¶ 23-26.

the court specifically found that a meaningful relationship with their father was in the children's best interests and that the current arrangement under the shared parenting plan was hindering the necessary reunification. This determination did not change between the Interim Order and the court's final judgment.

{¶21} Furthermore, courts have discretion to modify interlocutory orders at any time. *Yuse v. Yuse*, 8th Dist. Cuyahoga No. 89213, 2007-Ohio-6198, ¶ 15; *Varney v. Varney*, 8th Dist. Cuyahoga Nos. 70709 and 70710, 1997 Ohio App. LEXIS 4705 (Oct. 23, 1997). Finality does not attach until the court renders its final judgment. *Id*. Therefore, the trial court acted within its discretion to reconsider its Interim Order. Mother was not deprived of due process because she had notice of and participated in the status conference. Therefore, no structural error occurred. Without any error, there can be no plain error.

{¶22} The first assignment of error is overruled.

**Violation of the Interim Order**

{¶23} In the second assignment of error, Mother argues the trial court committed a reversible error in finding that she violated the Interim Order. She contends the Interim Order was voidable because the court lacked authority to order her to submit to psychological and psychiatric examinations and counseling.

{¶24} The Ohio Supreme Court defined voidable, as opposed to void, judgments as follows:

> It is said that, although in a sense every order which lacks jurisdictional support is erroneous, those which are erroneous for such lack of jurisdiction

are void and subject to collateral attack, whereas those which are erroneous for other than jurisdictional reasons are merely voidable and not subject to collateral attack.

*State ex rel. Beil v. Dota*, 168 Ohio St. 315, 319-320, 154 N.E.2d 634 (1958) (erroneous exercise of judicial power where there existed subject matter and personal jurisdiction is not void). Thus, a voidable order is one issued by a court possessing subject matter jurisdiction, but lacking authority to issue the order in question. *State ex rel. Gains v. Go Go Girls Cabaret, Inc.*, 187 Ohio App.3d 356, 2010-Ohio-870, 932 N.E.2d 353, ¶ 26-29 (7th Dist.).

{¶25} R.C. 3109.04(C) provides, in pertinent part: "*Prior to trial*, the court * * * may order the parents and their minor children to submit to medical, psychological, and psychiatric examinations." (Emphasis added.) The statute does not authorize the court to order the parents and their minor children to submit to psychological or psychiatric examinations *after trial*. However, R.C. 3109.04(B) states that when determining the allocation of the parental rights and responsibilities for the care of the children, "the court shall take into account that which would be in the best interest of the children." Thus, R.C. 3109.04(B) gives the trial court broad discretion when allocating parental rights and responsibilities.

{¶26} The court's Interim Order does not require the parties to submit to psychological or psychiatric examinations pursuant to R.C. 3109.04(C). To the contrary, the court ordered counseling to help the children re-establish a meaningful relationship with their father. Pursuant to R.C. 3109.04(B), the court determined that it was in the

children's best interest to maintain a meaningful relationship with their father and that counseling was necessary for that relationship to develop. Throughout the proceedings, the court had ordered consultations with therapists to assist with shared parenting, and all attempts at therapy failed. Dr. Lisa Green, who the court had appointed in the fall of 2010, ended the counseling relationship because Mother failed to cooperate and the children were disrespectful. Therefore, because the court was authorized to order the parents and children to participate in family therapy for the purposes of allocating parental rights and responsibilities, its Interim Order is a valid enforceable court order.

{¶27} The second assignment of error is overruled.

### Right to Privacy

{¶28} In the third assignment of error, Mother argues the court's final judgment of July 20, 2012, instructing Father to use video security cameras in his home, violates the children's constitutional right to privacy.

{¶29} The trial court's final judgment orders, in pertinent part:

6. For the purpose of assisting the children in making the transition to Father's home, Father shall do the following:

a. He shall provide security cameras in his home for the purpose of securing the safety of the children and others in the home and providing a record of the children's interaction with him and others.

{¶30} Mother cites *State ex rel. McCleary v. Roberts*, 88 Ohio St.3d 365, 2000-Ohio-345, 725 N.E.2d 1144, for the proposition that the children's right to privacy precluded the court from ordering the use of surveillance cameras in Father's home. In *McCleary*, a private citizen sought a writ of mandamus to compel the city of Columbus to

provide a copy of a photo identification database that contained identifying information of children, including children's names, home addresses, names of parents or guardians, and medical information. *Id.* at 368. The city's recreation department compiled the personal information of children who used recreational facilities as a safety measure. The Ohio Supreme Court held that the personal information contained in the city's database was not subject to disclosure under Ohio's Public Records Law. *Id.* at syllabus. The court reasoned that because a third party's request for information about a private citizen can reasonably be expected to invade that citizen's privacy, government records are not subject to disclosure if they provide little or no insight into the government's operations but contain personal information about private citizens. *Id.* at 369. The court further explained that disclosure of the children's identifying information would place the children at risk of irreparable harm. *Id.* at 371.

{¶31} Mother contends the court's final order requiring Father to use surveillance cameras to record the children at his house creates the same danger to the children that the court aimed to prevent in *McCleary*. She further asserts: "[T]here is nothing to prohibit Mr. O'Malley, who was known to possess child pornography, from disseminating naked pictures of the children." We disagree.

{¶32} The court's final order in this case does not violate the children's privacy rights and is consistent with the *McCleary* court's concern for children's safety. The use of security cameras to record the children in their Father's home is similar to the previously ordered videotaping of Father's visits under the shared parenting plan with the

children. Indeed, the court stated that the purpose of the cameras was to secure "the safety of the children and others in the home and providing a record of the children's interaction with him and others." Furthermore, Dr. McPherson, the children's guardian ad litem, suggested recording the visits as a result of the children's past behavior, which had been both violent and dishonest. Dr. McPherson stated:

> There were allegations of Mr. O'Malley being aggressive towards the children and there were allegations that the children were — children's behavior had been seriously aggressive towards adults and the environment * * * Given that both the children and the father, therefore, are extremely vulnerable in the situation, it was my recommendation that there be videotaping when the court made the decision to go forward with unsupervised visits.

{¶33} It is clear the security cameras were not intended to violate the children's right to privacy in any way. The court's order does not require Father to publish the videotapes to anyone. Father could decide to install security cameras in his home for his own protection if he so desired without a court order. Although the court's final order does not expressly prohibit Father from disseminating naked pictures of children, both Ohio and federal laws proscribe such conduct and impose strict penalties to prevent such actions.

{¶34} Therefore, the third assignment of error is overruled.

### Mother's Right to Visitation

{¶35} In the fourth assignment of error, Mother argues the court's final judgment violates her constitutional right to visit her children.

{¶36} With respect to Mother's right of visitation, the court's final judgment states:

Mother, the non-residential parent, shall have parenting time with the children pursuant to the Cuyahoga County Domestic Relations Court Standard Parenting Time Order; with the exception that her parenting time will not begin until the therapist has determined that the children have successfully made the transition to Father's home. The children's appropriate behavior will determine when Mother's parenting time shall begin.

**{¶37}** Parents have a constitutionally protected interest in the care, custody, and management of their children. *Troxel v. Granville*, 530 U.S. 57, 66, 120 S.Ct. 2054, 147 L.Ed.2d 49 (2000); *In re Murray*, 53 Ohio St.3d 155, 157, 556 N.E.2d 1169 (2000). For this reason, a parent's right of visitation with her children should only be denied under extraordinary circumstances. *Pettry v. Pettry*, 20 Ohio App.3d 350, 486 N.E.2d 213 (8th Dist.1984). Suspension of visitation is only appropriate where it can be demonstrated that particularly egregious conduct by the noncustodial parent would result in harm to the children. *Leasure v. Leasure*, 8th Dist. Cuyahoga No. 72415, 1998 Ohio App. LEXIS 987 (Mar. 12, 1998), citing *Conkel v. Conkel*, 31 Ohio App.3d 169, 509 N.E.2d 983 (4th Dist.1987).

**{¶38}** The trial court found evidence that continued visitation with Mother while the children were re-establishing their relationship with Father would harm the children. Dr. Timothy Kohl, who performed a psychological custody evaluation for the court, found that Mother willfully prevented the children from having a meaningful relationship with their father. During an interview with Dr. Kohl, Mother admitted she wanted Father to have no involvement in the children's lives.

**{¶39}** When Dr. Kohl asked the children in another interview what kind of relationship they would like to have with their father, P.O. stated: "I don't want to have any relationship with him. We don't love our father." P.O. also accused Father of failing to pay child support.[4] C.O., who was seven-years-old, stated in a sing-song manner, that she and her brother will celebrate when their father dies.

**{¶40}** P.O. also told Dr. Kohl that he had seen his father hit his mother and that he "got arrested for it!" When Dr. Kohl asked P.O. what he did when he saw his father hit is mother, he stated: "How could I remember what I did; I was only three!" And C.O. added: "Yeah, me too! I was only two!" When Dr. Kohl asked Mother in the children's presence whether she agreed that it was important for the children to have a relationship with their father, Mother replied:

> They should have a relationship with a father that makes them feel safe and important. * * * In the past, when they were with their father they have been hurt, and doctors told them they don't have to be with someone who hurts them. "Don't you agree with that?"

Dr. Kohl told Mother that he expected the children to be polite and courteous to their father during their interview together the following week and asked whether she shared those same expectations for the children. Mother ambiguously replied, "Kids, we can always go that far."

**{¶41}** The following week when the children returned for a visit with Father, P.O. addressed his father by declaring: "I don't love you!" C.O. added, "I hate him!" When

---

[4] Mother testified at trial that she received regular child support payments from Father.

Dr. Kohl reminded the children that their mother had agreed they were to be polite to their father, the children explained: "No. Mom changed her mind afterward, when we were in the car." According to Dr. Kohl, Father remained calm and asked them to recall memories of their good times together. He attempted to remind P.O. of their last night together before he was incarcerated, when P.O. allegedly told him, "You're the best dad in the world." P.O., who was close to tears, stated: "That never happened."

{¶42} When Dr. Kohl asked Father what he would like to say and have the children remember about this meeting together, he stated: "I love them, and I know they love me." P.O. remained close to tears while C.O. crossed her arms and, according to Dr. Kohl, "alternately glared with exaggerated disapproval at Father and grinningly looked away."

{¶43} Dr. Kohl concluded that Mother intended to alienate the children from their father and that Mother intentionally tried to sabotage Father's meeting with the children as part of the evaluation. He also concluded:

> Rather than learning their oppositional, fearful attitudes solely from personal experience, it is this examiner's opinion that these children's attitudes and beliefs toward father have, in large part, been internalized based on their mother's experience, perception, and influence. These children have begun to adopt a maladaptive attitude of "mother against the world." These children have adopted the belief that only mother has their interest at heart, that they must "watch their backs," and that they need to be vigilant toward others, who lie, deceive, and "trick" them. This is increasingly likely to instill in the children bitter, aggrieved, and victim attitudes.

> Based on these conclusions, Dr. Kohl ultimately determined that it is not possible for the O'Malley children to have a meaningful relationship with their father while they are in their mother's care, given mother's continuing open mentality of exaggerated fear, avoidance, and hatred of father. Mother is currently incapable of fostering common courtesy in the children toward their father, much less fostering respect, affection, and love for him.

{¶44} As previously stated, other witnesses corroborated Dr. Kohl's observations of the children's behavior and attitudes. The children's aunt testified that after Father went to prison, and when the children were in Mother's sole custody, they became "destructive, hateful and demonic." Father's girlfriend testified that they became increasingly "vicious and hateful." Referring to the children's statement, the guardian ad litem stated:

> The reality base for the statements which have been made, starting with assertions that go back to the time[s] when the mother picked up the children in the middle of the night at the Patrick O'Malley home, and proceeding up to the present time, all suggest an ongoing program of disinformation and discouragement, if not outright negative programming of these youngsters with respect to their father.[5]

The record is replete with evidence showing that Mother has caused serious damage to the children's attitudes and relationship with their father that justified a temporary suspension of Mother's visitation until the children have successfully made the transition to Father's home.

{¶45} Moreover, R.C. 3109.04(B) gives the court discretion to "take into account that which would be in the best interest of the children." The court found that it would be in the children's best interest to have a meaningful relationship with their father. Under the circumstances of this case, including recommendations from two psychologists, the court reasonably found that a temporary suspension of Mother's visitation with the children was necessary in order for the children to re-establish a healthy relationship with

---

[5] Mother picked the children up from Father's home in the middle of the night without Father's knowledge. He woke in the morning to find they were gone.

their father. Therefore, the trial court acted within its discretion and did not violate Mother's constitutional rights when it temporarily suspended her right of visitation.

{¶46} Mother also asserts that Dr. Kohl diagnosed the children with "parental alienation syndrome," but that he was not competent to render such an opinion because he was not licensed to practice child psychology in Ohio. However, Dr. Kohl never made this diagnosis. He merely described his observations of the children and concluded that they were alienated from their father as a result of their mother's behavior.

{¶47} Furthermore, Dr. Kohl's competency to render expert opinion regarding the children was established on the record. Dr. Kohl admitted on cross-examination that when he submitted his licensing registration, he did not mark the box indicating he was competent to provide service to children. However, he later explained that he did not feel it was necessary to check the box regarding children's services because he indicated on the registration form that he conducted "psychological evaluations and civil forensic services," which would include evaluations of children for custody purposes. The registration form thus indicates that he may not be competent to provide counseling to children but he is competent to perform evaluations. There was no evidence to suggest Dr. Kohl was not competent to make evaluations for custody proceedings. Therefore, Dr. Kohl's competency to render expert opinions regarding the children was established.

{¶48} The fourth assignment of error is overruled.


**Separate Counsel for the Children**

**{¶49}** In the fifth assignment of error, Mother argues the trial court abused its discretion by failing to appoint separate counsel for the minor children. She contends the trial court should have appointed counsel for the children because the guardian ad litem's opinions differed from those expressed by the children.

**{¶50}** Mother cites Civ.R. 75(B)(2) in support of her argument. Trial court decisions on whether to appoint counsel for children are reviewed for an abuse of discretion. *In re J.L.R. & M.M.R.*, 4th Dist. Washington No. 08CA17, 2009-Ohio-5812, ¶ 37. Civ.R. 75(B)(2) states: "When it is essential to protect the interests of a child, the court *may* join the child of the parties as a party defendant and appoint a guardian ad litem and legal counsel, if necessary, for the child and tax the costs." (Emphasis added.)

**{¶51}** Civ.R. 75(B)(2) does not require the court to appoint counsel for the children in every case where there is conflict between the children's wishes and the guardian ad litem's assessment of their best interest. Here, the court determined the children's interests were sufficiently protected by the guardian ad litem and there was no need to appoint counsel. The guardian ad litem was a well-qualified psychologist with considerable experience in court proceedings. Further, appointed counsel would have unnecessarily added to the expense of this litigation. Under these circumstances, we find no abuse of discretion in the court's decision not to appoint counsel for the children.

**{¶52}** Mother also relies on Sup.R. 48(D)(8), which states: "When a guardian ad litem determines that a conflict exists between the child's best interest and the child's wishes, the guardian ad litem shall, at the earliest practical time, request in writing that the

court promptly resolve the conflict by entering appropriate orders." This rule does not stand for the proposition that the court *must* appoint counsel for the children. Moreover, Sup.R. 48 is a general guideline that does not have the force of statutory law. *In re D.C.J.*, 8th Dist Cuyahoga Nos. 97681 and 97776, 2012-Ohio-4154, ¶ 48. Therefore, the trial court was not obligated to appoint counsel pursuant to Sup.R. 48(D)(8).

{¶53} The fifth assignment of error is overruled.

### Guardian Ad Litem Testimony

{¶54} In the sixth assignment of error, Mother argues the trial court abused its discretion by relying on the guardian ad litem's report and testimony. She contends Dr. McPherson, the guardian ad litem, violated Sup.R. 48(D)(8) and Sup.R. 48(D)(13)(g), and that her testimony should have been stricken.

{¶55} Sup.R. 48(D)(8) requires the guardian ad litem to seek court orders to resolve a conflict that exists between the guardian's best interest determination and the child's wishes. Sup.R. 48(D)(13)(g) requires the guardian ad litem to interview the children's medical providers as part of her investigation.

{¶56} Again, the rules of superintendence are guidelines and do not have the force of statutory law. *In re D.C.J.,* 2012-Ohio-4154, at ¶ 48. And in any case, we have already determined that the court did not abuse its discretion when it decided not to appoint counsel for the children.

{¶57} Mother nevertheless contends that McPherson's testimony should be stricken because she disregarded the opinions of several treating health professionals in violation

of Sup.R. 48(D)(13)(g). She cites *Nolan v. Nolan*, 4th Dist. Scioto No. 11CA3444, 2012-Ohio-3736, in which the court struck the guardian ad litem's testimony. However, the *Nolan* court did not hold that the superintendence rules are the equivalent to statutory laws. It merely used Sup.R. 48 as a guideline and ultimately determined, based on the facts of that case, that the guardian ad litem failed to adequately investigate the case.

{¶58} The record indicates Dr. McPherson thoroughly investigated this case. She interviewed the parties, numerous therapists, other family members, and school personnel. She also reviewed the evaluations from two other psychologists. Over the course of the proceedings, Dr. McPherson continued to have contact with the parties and the children to determine if any progress had been achieved in the reunification of the children with their father.

{¶59} Moreover, Dr. McPherson's report does not disregard the evidence provided by the children's therapists and physicians. Rather, she found the "testimony and records of a variety of treating personnel were patently reflective of mother's perspectives and information." She explained:

> To the extent that these sources included reports of the children's input, the content mirrored the mother's views when it came to the family situation. Also presented were reports and testimony of professionals who had not had the advantage of having evaluated both of the parties. In both cases, the difficulties of the mother in supporting a relationship with father were noted.

{¶60} Therefore, because the rules of superintendence are not binding on the trial court and because the record reflects that Dr. McPherson completed a thorough

investigation, we find no abuse of discretion in the court's reliance on her findings and recommendations.

{¶61} The sixth assignment of error is overruled.

### Mandatory Guidelines for Trial and Disposition

{¶62} In the seventh assignment of error, Mother argues the trial court failed to reach a final disposition within the time frame set forth in Sup.R. 40(A)(3), which imposes a 120-day limit for trial courts to rule on motions. She asserts that because she filed her motion to terminate the parties' shared parenting plan in October 2008, and the court did not render a final judgment until July 2012, the trial court violated her right to due process.

{¶63} Mother filed two affidavits of disqualification with the Ohio Supreme Court to disqualify the trial judge in this case. In the second affidavit filed in October 2012, Mother argued the trial judge's delay in rendering its final judgment unfairly prejudiced her. In denying her request for disqualification, the Ohio Supreme Court stated:

> The trial court's final order sets forth several reasons for the prolonged nature of the case, including Father O'Malley's incarceration, the fact that Mother O'Malley has had multiple attorneys, the judge's guardian ad litem's "busy schedules," and the previous affidavit of disqualification filed in 2011.
> * * *
>
> The trial court's delay in deciding the parents' motion to modify parental rights — and the prolonged period of the trial — is concerning. But similar to the other allegations in this proceeding, affiants have failed to demonstrate the court's delay is the product of bias or prejudice against Mother O'Malley.

{¶64} Furthermore, Mother was responsible for much of the delay. As the Supreme Court noted, Mother had five different attorneys during the course of this

litigation and filed a multitude of motions. She filed the first affidavit of disqualification days before trial was scheduled to begin. She also filed at least five motions to continue the proceedings, which resulted in further delays.

{¶65} We find no due process violation. The trial court considered all the evidence, which was substantial, and authored an 83-page opinion. It is clear the trial court tried to do what was in the best interest of the children under the troublesome circumstances presented in this case.

{¶66} Therefore, the seventh assignment of error is overruled.

### Best Interest of the Children

{¶67} In the eighth assignment of error, Mother argues the trial court abused its discretion in determining the best interest of the children by failing to consider certain factors set forth in R.C. 3109.04(F)(1).

{¶68} R.C. 3109.04(F)(1) lists the relevant factors the court should consider in determining the best interest of the child. The relevant factors include:

> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;
>
> (e) The mental and physical health of all persons involved in the situation;

(f) The parent more likely to honor and facilitate court-approved parenting time or visitation and companionship rights;

Although a trial court must follow the dictates of R.C. 3109.04 in making child custody decisions, it enjoys broad discretion when determining the appropriate allocation of parental rights and responsibilities. As the Ohio Supreme Court in *Miller v. Miller*, 37 Ohio St.3d 71, 74, 523 N.E.2d 846 (1988), held:

> The discretion which a trial court enjoys in custody matters should be accorded the utmost respect, given the nature of the proceeding and the impact the court's determination will have on the lives of the parties concerned. The knowledge a trial court gains through observing the witnesses and the parties in a custody proceeding cannot be conveyed to a reviewing court by a printed record. (Citations omitted.)

{¶69} Mother argues the trial court abused its discretion because it failed to consider the children's desire to live solely with their mother as required by R.C. 3109.04(F)(1)(b). However, the court conducted two in camera interviews of the children and heard their wishes. The court found, based on the evidence including the in camera interviews, that "Mother does not see that bending the children's will to conform to her own attitudes, feelings, and beliefs and agenda is causing the children to be unruly, distrustful, untruthful, anxious, confused, aggressive, and sad." As previously discussed, this finding is well supported by both expert and lay witness testimony. Thus, despite Mother's argument otherwise, the trial court considered the children's wishes and found that their wishes would not be in their best interest.

{¶70} Mother also argues the trial court failed to consider the children's interactions with their father as required by R.C. 3109.04(F)(1)(c). Yet the trial court

described their interactions with their father in detail throughout its 83-page opinion. The children were hostile, aggressive, and hateful but the court found that they behaved this way as a result of their mother's attitudes and influence. The court determined that granting custody to the father would allow their relationships to heal and improve.

{¶71} Mother argues the trial court failed to consider the children's adjustment to school, home, and the community. This assertion is also not supported by the record. Based on the evidence adduced at trial, the court found that while the children were in Mother's custody, P.O. was late for school on 33 separate days during the 2010-2011 school year. C.O. was late on 38 days that year. The school administrator spoke to Mother about his concerns regarding the children's sporadic attendance. Mother took the children to the doctor 23 times in 2009, and 33 times in 2010. She also took them to Urgent Care facilities on numerous occasions.

{¶72} The guardian ad litem opined that the children should be removed from their current school and enrolled in the school district where Father intended to live, in part because of the negative views the Chagrin Falls teachers and administrators had of Father. The court noted that Father met with the North Royalton school superintendent to devise a plan to efficiently transition the children into the new school.[6] Thus, the court considered the children's adjustment to school, home, and community and determined that a fresh start in Father's community would be in the children's best interest.

---

[6] Father has since established a residence in Independence, Ohio where the children are currently enrolled in school.

{¶73} Mother contends the court failed to consider the mental health of all persons involved with the children as required by R.C. 3109.04(F)(1)(e). The parties' physical health was not an issue. Mother contends the court failed to consider evidence of Father's mental health condition when it refused to allow an FBI agent, who participated in the investigation of obscenity allegations against Father, to testify at trial. The FBI agent proffered testimony that Father's home computer contained child pornography, bestiality, and stories about the rape of children. However, the FBI agent was not a psychologist and was not competent to render expert opinions of Father's mental condition. The court also noted that Mother gave the computer to the FBI during the original divorce proceedings, suggesting perhaps that the evidence was not a reliable reflection of Father's mental state.

{¶74} Mother voiced concerns about Father's mental health in light of the fact that he pleaded guilty to a federal charge of transportation and importation of obscene materials. The court relied on Dr. Steven Levine, who conducted a sexual risk assessment of the parties and concluded that Father posed no sexual threat to the children. The court also found:

> There was no indication at [the time of the divorce] or any of these proceedings that the children had ever seen [the obscene] materials. There are no reports from any counselors, therapists, doctors, or police departments that indicate any sexual abuse of these children.

{¶75} The court also considered the state of Mother's mental health and determined that her attitudes and behavior were "causing the children to be unruly, distrustful, untruthful, anxious, confused, aggressive, sad."

**{¶76}** Finally, the court considered the mental health of the children. In this regard, the court found: "The children's unreasonable negative feelings and beliefs such as anger, hatred, rejection, disrespect, avoidance, and fear toward Father are significantly disproportionate to the children's actual past experiences." The court recognized that the "children ha[d] been adversely affected by Mother's and Father's continuing conflicts and their inability to communicate with one another about their children." Finally, the court concluded:

> Mother has had numerous counselors for these children and the Court has observed that such counseling was not helpful because of the one-sided approach of the counselors and Mother's unwarranted conviction of Father's domestic violence toward the children.
> * * *
> [P.O.] is the most sensitive and troubled child. He appears to be more adversely affected by these litigious proceedings showing more anxiety, depression, and psychosomatic symptoms than his sister, [C.O.]

Clearly the court complied with its duty to consider all the factors set forth in R.C. 3109.04(F)(1) when it made its best interest determination. The evidence overwhelmingly supports the trial court's conclusions. Therefore, we find no abuse of discretion.

**{¶77}** The eighth assignment of error is overruled.

### Visitation

**{¶78}** In the ninth assignment of error, Mother argues the trial court abused its discretion by failing to consider R.C. 3109.051 when establishing Mother's right of visitation. She contends the trial court improperly required approval from the children's

therapist after it had been determined that the children were successfully transitioned to Father's home and their behavior improved.

{¶79} R.C. 3109.051(A) provides that when deciding a parent's right of visitation, the trial court

> shall make a just and reasonable order or decree permitting each parent who is not the residential parent to have parenting time with the child at the time and under the conditions that the court directs, unless the court determines that it would not be in the best interest of the child to permit that parent to have parenting time with the child and includes in the journal its findings of fact and law.

{¶80} R.C. 3109.051(C) further provides that when determining whether to grant parenting time rights to a parent, "the court shall consider all other relevant factors, including but not limited to, all of the factors listed in division (D) of this section." The factors listed in R.C. 3109.051(D) are the same factors found in R.C. 3109.04.

{¶81} As previously stated, the court found Mother purposefully programmed the children to fear and hate their father. The court also found that their unruly and disrespectful behavior was caused by "Mother's campaign of deception and distortion." Based on these findings, the trial court reasonably concluded that it would not be in the best interest of the children to permit Mother to have parenting time until after the children had an opportunity to heal their relationship with Father.

{¶82} The ninth assignment of error is overruled.

**Child Support Worksheet**

{¶83} In the tenth assignment of error, Mother argues the trial court abused its discretion by failing to complete and attach a child support computation worksheet to its

final judgment.   She contends the trial court erred in requiring her to pay half the guardian ad litem fees, and the guardian ad litem's attorney fees, and expert fees as child support.

**{¶84}**   In its final judgment, the trial court modified child support by cancelling its order designating Father the obligor, and ordering the parties to pay in equal shares the expert fees, guardian ad litem fees, and the guardian ad litem's attorney fees. Paragraph 18(b) of the court's final judgment states, in relevant part:

> [E]ach party shall pay a minimum of $300 each month to the GAL who will reimburse Attorney Thurman with one-half of said payment until all fees are paid in full.   The GAL fees are awarded in the nature of child support.

Paragraphs 19 and 20 of the final judgment also ordered Mother to pay in full the expert fees for Dr. Levine and Dr. Kohl "in the nature of child support."

**{¶85}** Although the court ordered Mother to pay half the guardian ad litem fees and the expert fees as child support, it did not attach a child-support worksheet or make that worksheet part of the record as required by R.C. 3113.215.   A trial court's failure to complete a child-support worksheet and make it part of the record as required by R.C. 3113.215 is error as a matter of law. *Marker v. Grimm*, 65 Ohio St.3d 139, 601 N.E.2d 496 (1992), paragraphs one and two of the syllabus.   Nevertheless,  reversal and remand are not always dictated when a court does not comply with R.C. 3113.215.   *See, e.g.*, *McCoy v. McCoy*, 105 Ohio App.3d 651, 655-656, 664 N.E.2d 1012 (4th Dist.1995).   Civ.R. 61 states that

> no error or defect in any ruling or order * * * is ground for * * * vacating, modifying or otherwise disturbing a judgment or order, unless refusal to take such action appears to the court inconsistent with substantial justice.   The court at every stage of the proceeding must disregard any error or defect in the proceeding which does not affect the substantial rights of the parties.

*See also* R.C. 2309.59. Therefore, we will not reverse the order including the expert fees and guardian ad litem fees as a child support obligation unless the failure to complete and journalize a child support worksheet affected a substantial right.

{¶86} In this case, the court did not create a new child support worksheet but made reference to its previous child support worksheet in the final judgment. Although the court modified child support, the failure to file a new child support worksheet did not prejudice either of the parties. The court determined that Mother had no income other than the money she received from her family, and that this fact had not changed throughout the post-decree litigation. Father's only source of income from his Ohio Public Employees Retirement System account had also not changed. Yet, Father received full custody of the children. Therefore, equity requires Father be relieved of the previously ordered child support to Mother.

{¶87} The trial court also found that neither party had paid the guardian ad litem, her court appointed attorney, or the expert fees despite prior court orders to do so. At the time of the court's final judgment, the parties owed the guardian ad litem and her attorney over $42,000. Dr. Levine had an outstanding bill of $2,375, and Dr. Kohl had an outstanding bill for $1,575. Pursuant to R.C. 3105.73, a domestic relations court may award all or part of the litigation expenses to either party if the court finds the award equitable. Guardian ad litem fees, expert fees, and attorney fees are "litigation expenses" under R.C. 3105.73. *In re S.B.*, 11th Dist. Ashtabula No. 2010-A-0019, 2011-Ohio-1162,

¶ 119 (guardian ad litem fees are litigation expenses); *Brooks v. Brooks*, 6th Dist. Fulton No. F-11-020, 2013-Ohio-405, ¶ 24 (expert fees are litigation expenses).

**{¶88}** In determining whether an award of litigation expenses is equitable, the court may consider the parties' marital assets and income, any award of temporary spousal support, the conduct of the parties, and any other relevant factors the court deems appropriate. R.C. 3105.73(A). We review the trial court's assessment of litigation expenses for an abuse of discretion. *Carmen v. Carmen*, 8th Dist. Cuyahoga Nos. 97539 and 97542, 2012-Ohio-325, ¶ 41.

**{¶89}** Here, the court considered the fact that Mother has little income. Nevertheless, it found that Mother made the proceedings much longer and more complex than necessary. The guardian ad litem fees and expert fees increased substantially as a result of Mother's conduct, and the record clearly supports this conclusion. Under these circumstances, we find no abuse of discretion in the trial court's order requiring Mother to pay half the guardian ad litem fees and all of the expert fees.

**{¶90}** The trial court required the fees to be paid "in the nature of child support" to prevent the parties from discharging these obligations in bankruptcy. If fees were awarded as "costs," they could be discharged through bankruptcy proceedings. *Sutherland v. Sutherland*, 61 Ohio App.3d 154, 572 N.E.2d 215 (10th Dist.1989). However, pursuant to 11 U.S.C. 523(a)(5), bankruptcy "does not discharge an individual debtor from any debt * * * for a domestic support obligation." *Jackson v. Herron*, 11th Dist. Lake No. 2004-L-045, 2005-Ohio-4039 ("the United States Bankruptcy Court for the Northern

District of Ohio * * * held that the nature and duties performed by guardian ad litem 'is clearly within the nature of support to meet the needs of the minor child.' As such, guardian ad litem fees, like a child support obligation, is a nondischargeable debt.")(quoting *In re Lever*, 174 B.R. 936, 942 (Bankr.N.D.Ohio 1991). *See also Raleigh v. Hardy*, 5th Dist. Licking No. 08 CA 0140, 2009-Ohio-4829, ¶ 38; *In re Thomas*, 8th Dist. Cuyahoga Nos. 86375 and 86939, 2006-Ohio-3324, ¶ 7-8.

{¶91} Under the circumstances presented in this case, we find no abuse of discretion in the trial court's judgment ordering Mother to pay half the guardian ad litem fees, half the guardian ad litem's attorney fees, and all of the expert fees "in the nature of child support," even though the court did not make a modified child support worksheet part of the record.

{¶92} The tenth assignment of error is overruled.

### Cumulative Error

{¶93} In the eleventh assignment of error, Mother asserts that the trial court committed multiple errors that denied Mother her right to a fair trial.

{¶94} Pursuant to the cumulative error doctrine, which is usually presented in criminal cases, a conviction will be reversed where the cumulative effect of errors in a trial deprives the defendant of the constitutional right to a fair trial even though each individual error by itself does not constitute cause for reversal. *State v. Garner*, 74 Ohio St.3d 49, 656 N.E.2d 623 (1995).

**{¶95}** We have found "the extension of the cumulative error doctrine to civil cases is warranted where the court is confronted with several errors, which either are harmless individually or have marginally prejudicial effects, but combine to require a new trial." *Edge v. Fairview Hosp.*, 8th Dist. Cuyahoga No. 95215, 2011-Ohio-2148, ¶ 46. However, we do not find the doctrine applicable here where there have not been multiple errors.

**{¶96}** Therefore, the eleventh assignment of error is overruled.

**{¶97}** Judgment affirmed.

It is ordered that appellee recover from appellant costs herein taxed.

The court finds there were reasonable grounds for this appeal.

It is ordered that a special mandate be sent to the domestic relations division to carry this judgment into execution.

A certified copy of this entry shall constitute the mandate pursuant to Rule 27 of the Rules of Appellate Procedure.


EILEEN T. GALLAGHER, JUDGE

MELODY J. STEWART, A.J., and
KATHLEEN ANN KEOUGH, J., CONCUR