[Cite as *Lowery v. Ridgeway*, 2015-Ohio-5051.]

# IN THE COURT OF APPEALS OF OHIO
## THIRD APPELLATE DISTRICT
## HANCOCK COUNTY

THERESA LOWERY FKA
THERESA RIDGEWAY,                                    CASE NO. 5-15-20

    PLAINTIFF-APPELLANT,

  v.

JAMES RIDGEWAY,                                      **O P I N I O N**

    DEFENDANT-APPELLEE.

**Appeal from Hancock County Common Pleas Court
Domestic Relations Division
Trial Court No. 2010-DR-200**

**Judgment Affirmed**

**Date of Decision:  December 7, 2015**

APPEARANCES:

    *John C. Filkins* **for Appellant**

    *Garth W. Brown* **for Appellee**

**WILLAMOWSKI, J.**

{¶1} Plaintiff-appellant, Theresa Lowery, f.k.a. Theresa Ridgeway ("Theresa"), brings this appeal from the judgment of the Common Pleas Court of Hancock County, Ohio, Domestic Relations Division, which adopted the magistrate's recommendations, naming Defendant-appellee, James Ridgeway ("James"), as the residential parent of the parties' children, ordering Theresa to pay child support, finding her in contempt, approving guardian ad litem fees, and ordering Theresa to pay court costs incurred in the proceedings. For the reasons that follow, we affirm the trial court's judgment.

*Factual and Procedural Background*

{¶2} Theresa and James are the parents of three minor children, J.R., L.R., and A.R. Theresa initiated divorce proceedings in in Hardin County in June 2007. At the time, J.R. was four years old; L.R. was two years old; and A.R. was not yet born. During the initial divorce proceedings, Theresa limited James's parenting time until a shared parenting plan was entered and approved by the magistrate of the Hardin County Court of Common Pleas, Domestic Relations Division, on October 7, 2008. The parties were granted a divorce in December 2008. James "only had regular parenting time between October 2008 and April 2009" and after April 2009, he was unable to exercise his parenting time with the children. (R. at 232, Magistrate's Decision, May 31, 2012, at 19.)

{¶3} In May 2010, the case was transferred to Hancock County and on June 18, 2010, Theresa filed a motion to terminate the shared parenting plan and to designate her as the residential parent while terminating or limiting James's parental rights. (R. at 6.) Before the matter came up for a hearing, the parties had filed multiple other motions. We will only discuss the filings that are of relevance to this appeal.

{¶4} In September 2010, Theresa filed a Motion for Emergency Order Suspending Defendant's Parenting Time until Court Determination of Residential Parent Status. (R. at 30.) In November 2010, James filed a motion to show cause against Theresa for her failure to comply with the shared parenting plan by withholding the children from him. (R. at 38.) James also requested immediate temporary orders for parenting time based on Theresa's refusal to comply with the shared parenting plan. (R. at 39.) In January 2011, James filed a motion for reallocation of parental rights and responsibilities to him. (R. at 69.) Later the same month, Theresa filed a motion for magistrate's order prohibiting James from claiming any of the minor children as dependents for the 2010 tax year. (R. at 71.) That motion was denied. (R. at 110.) In February 2011, Theresa filed a motion for magistrate's order prohibiting James "from going to the children's school and/or the childcare provider's residence to pick up the children." (R. at 88.) Later the same month, James filed a motion for parenting time through Harmony

House in order to "re-establish his relationship with his children." (R. at 91.) That motion was granted. (R. at 93.) In May 2011 James filed another motion to show cause against Theresa, alleging that Theresa had claimed the children on her 2010 taxes and had not taken any action to amend the return to reflect the magistrate's order. (R. at 116.) In September 2011, Theresa filed a motion for an ex parte order prohibiting James from visiting the minor children at school. (R. at 180.) That motion was denied. (R. at 181.)

{¶5} In March 2011, the trial court appointed a guardian ad litem for the children. (R. at 103.) Following the guardian ad litem's report, which recommended that James be named the residential parent, Theresa moved for an appointment of attorney to represent the interests of the children. In her motion Theresa contended that the guardian ad litem's position is "in contravention of the expressed desires of the children." (R. at 132.) The trial court denied the motion finding no evidence "to establish that an attorney for the children is either necessary or essential to protect the interest of the children." (R. at 144; *see also* Tr. at 30.) The trial court did, however, conduct an in camera interview with the two older children. (*See* R. at 154.)

{¶6} The parties presented their evidence on all pending issues on seven different dates, between July 2011 and February 2012. The central issue at the hearing was the matter of custody and visitation rights with the children. It was

James's claim that Theresa had restricted his ability to see the children, effectively alienating him from the children. Theresa argued that James had failed to make an effort to see the children and that he had been violent with them in the past. Based on the testimony and evidence presented at the hearing, the magistrate of the trial court issued its thirty-four-page-long Decision on May 31, 2012. We summarize the relevant parts of the magistrate's factual findings below.

### Magistrate's Findings

#### The Children

{¶7} The parties have three children. At the time of the hearing, J.R. was in a primary school in Findlay. (R. at 232, at 5.) The magistrate noted J.R.'s speech problems and ADHD. J.R. participated in speech intervention through the school. (*Id.*) He also received speech therapy and treatment for ADHD. (*Id.*) J.R. did "reasonably well in school" and participated in enrichment clusters. (*Id.*) J.R. did not have behavior problems but was "very emotional" and displayed anxiety at school, which was "not unique." (*Id.*) The magistrate noted "extreme anxiety in situations where Mother may be contacted." (*Id.*) J.R. was involved in multiple extracurricular activities, including cub scouts, sign language, choir, volleyball, "just say no," spring soccer, and wrestling.

{¶8} L.R. was a first grader. (*Id.*) The magistrate noted that L.R. had "very poor vision" and hearing problems, which were addressed through an IEP at

school.  (*Id.*)  The school was also providing speech therapy.  (*Id.*)  L.R. participated in cub scouts, soccer, and wrestling.  (*Id.*)

{¶9} A.R. was in pre-school during school year 2010-2011.  The magistrate noted that A.R. had "serious hearing problems and has Apraxia of speech.  Her speech problems are very significant.  Only a few people can understand A.R.'s speech."  (*Id.* at 5-6.)  A.R. had an IEP and was receiving speech therapy through the school.  (*Id.* at 6.)  The magistrate noted that A.R. "is in Gold Medal gymnastics, but has trouble interacting with the other children."  (*Id.*)

{¶10} The magistrate met with J.R. and L.R. for in camera interviews.  At the time, J.R. was eight years old and L.R. was six years old.  A.R. was three years old and chose not to participate.  (*Id.* at 4.)  The magistrate concluded that the children were "of tender age and limited understanding."  (*Id.* at 5.)  The magistrate noted that the children were anxious and had difficulty maintaining focus during the interview.  Although both boys expressed that they did not want to see their father, they could not articulate the reasons.  (*Id.* at 5.)  Of note, the magistrate commented that L.R.'s statements were "primarily based on other peoples' stories," and J.R.'s statements "did not appear to be based on his personal recollections."  (*Id.*)  The magistrate concluded that neither boy had "sufficient reasoning ability to express their wishes and concerns with respect to the allocation of parental rights and responsibilities."  (*Id.*)

*The Parties*

**{¶11}** The magistrate made the following observations about the parties. After divorcing James, Theresa married Steven Lowery ("Steven"), and they live together in Findlay, Ohio. (*Id.* at 6.) As of the time of the magistrate's decision, Steven had known the children for over four years and had a very positive relationship with them. (*Id.*) The magistrate found that Steven was involved in the children's extracurricular activities and had taken the children to doctor's appointments. (*Id.*) Theresa and Steven attended church with the children. (*Id.*) The children referred to Steven as Dad. (*Id.*) The magistrate noted that "[a]t some point" after the hearing in this case commenced and concerns over children calling Steven "Dad" were raised, Theresa and Steven attempted to correct the children. Theresa testified that they "have tried everything to correct it." (*Id.*) The magistrate did not find this statement credible. (*Id.*) Theresa did not submit any evidence of her income at the hearing, but after the hearing she submitted "a tax return for 2010 showing income of $15,049.00, and a W2 form for 2011 showing unemployment compensation of $7,281.00." (*Id.*)

**{¶12}** The magistrate found that Theresa had been the primary caretaker for the children and she was responsible for scheduling and taking the children to medical appointments, as well as contacting the school. (*Id.* at 6.) Theresa's

family had a history of speech and hearing problems and therefore, Theresa had "experience and training in meeting the special needs of the children." (*Id.* at 6.)

**{¶13}** At the time of the hearing, James lived near Dunkirk, Ohio. He worked at Kuss Corporation a.k.a. Cummins Filtration, and at IOP Filter in Findlay, earning $39,755.55 a year. (*Id.* at 7.) James maintained health insurance and dental insurance for the children. (*Id.*) In spite of Theresa's allegations of physical and sexual abuse, the magistrate found no evidence that James had "ever sexually or physically abused the children, or permitted abuse." (*Id.* at 9.) James was in a long-term relationship with Naomi Corwin ("Naomi"), whose children were ages 16, 12, and 6. Naomi had an old criminal record, which did not include abuse or neglect of children, and which "may just be a disorderly conduct conviction." (*Id.* at 7.)

**{¶14}** James did not participate in school meetings or conferences. (*Id.* at 6.) He had not been in touch with the children's doctors or counselors since October 2010. (*Id.* at 13.) Although James was "not perfectly current" in his child support payments, the magistrate found him "substantially compliant with the child support orders." (*Id.* at 13.)

*Relationship between the Parties*

**{¶15}** The magistrate commented that throughout the divorce proceedings in Hardin County, "the parties did not cooperate with each other." (*Id*. at 7.)

Theresa apparently "withheld the children" from James and made "unsubstantiated" allegations to children's protective services of physical and sexual abuse by James. (*Id.* at 7; *see also* R. at 259, at 2.) The magistrate commented that the parties' shared parenting plan, approved in October 2008, "established a rather complicated schedule that provided Father with parenting time with the children each week, during summer vacations, and on holidays." (R. at 232, at 4.)

{¶16} Between October 2008 and April 2009, James had "most of his scheduled parenting time." (*Id.* at 7.) On April 8, 2009, the parties got into a heated argument in front of the children during a visitation exchange. As a result, Theresa left without exchanging the children for James's scheduled parenting time. James followed in his vehicle. (*Id.* at 8.) The police were called to "a domestic dispute in progress" and Detective David Gonzales ("Detective Gonzales") of the Findlay Police Department was flagged down by James. (*Id.* at 8.) James talked about the situation to Detective Gonzales. His demeanor was described as "appropriate"; he was "cooperative and did not appear to be a threat." (*Id.*) Yet, Theresa filed a Petition for a Civil Stalking or Sexually Oriented Offense Protection Order based on the April 8 incident. James had "essentially not seen the children" since that time. (*Id.* at 8.)

**{¶17}** Theresa's petition for a protection order was pending for over a year and was eventually resolved in May 2010, when the parties entered into a consent agreement. According to the consent agreement, James was allowed to contact Theresa in writing on issues relating to children. The magistrate described James's attempts to contact Theresa, as follows.

> Since April 2009, Defendant attempted to contact Plaintiff by telephone once. In 2011, he called the last number he had for Plaintiff and left a message about Christmas visitation. Plaintiff received the message. Plaintiff did not return the call. On or about June 10, 2010, Defendant sent a letter to Plaintiff by certified mail. (Plaintiff's Exhibit 20). This written communication was sent less than two weeks after the Civil Stalking Protection Order Consent Agreement was issued which permitted written communication from Defendant to Plaintiff. On June 23, 2010, he received the letter back marked unclaimed. On July 3, 2010, Defendant sent a letter dated July 1, 2010 to Plaintiff by certified mail. After July 28, 2010, he received the letter back marked unclaimed. (Plaintiff's Exhibits 21, 23, and 25). On July 20, 2010, Defendant sent a letter to Plaintiff by certified mail. (Plaintiff's Exhibit 22). He received the letter back marked unclaimed. On September 24, 2010, Defendant sent a letter to Plaintiff by certified mail. Mr. Lowery signed for the letter on September 25, 2010. (Plaintiffs Exhibit 24). Plaintiff did not respond to the letter. Defendant sent other letters but did not submit written evidence at hearing.

(*Id.* at 8-9.)

**{¶18}** The magistrate noted that Theresa "has made no effort to contact Defendant since before April 8, 2009," and further described Theresa's actions as follows.

Since April 2009, Plaintiff has provided no written notices to Defendant. Plaintiff has not provided Defendant notice of parent-teacher conferences, Boy Scouts, or any of the children's activities.

The children were in counseling with Barbara Stickle at the Family Resource Center during the divorce. Services started on January 4, 2008. At some point, the counselor initiated a joint counseling session with [J.R.] and his father. The joint session went well and progress was made. After this joint session with father and child, Mother terminated counseling with Ms Stickle. Mother terminated the counseling without consultation with Father. Plaintiff says that after this session, she tried to schedule more counseling sessions, but it just would not fit into the schedule. She also indicated that [J.R.] was no longer comfortable counseling with Ms Stickle. Mother's statements of why she terminated counseling with Ms Stickle are not credible.

(*Id.* at 9.)

{¶19} Theresa wanted James to consent to a step-parent adoption believing it would be in the children's best interest to terminate James's parental rights. (*Id.* at 13.) Conversely, the guardian ad litem recommended that James be named as the residential parent. (*Id.* at 21.)

*James's Visits with the Children*

{¶20} The magistrate recognized that "[t]hroughout the pendency of this case, Defendant has not been receiving his regular scheduled parenting time." (*Id.* at 9-10.) After James's request for supervised visitations at Harmony House was granted, the following "pattern developed in the conduct of the visits." (*Id.* at 10.)

Mother would bring the children to the Harmony House. Father would come to the Harmony House and would go to the assigned room. Mother and Harmony House staff would encourage the

- 11 -

children to participate in the visits.  The children would refuse to enter the visitation room.  Harmony House staff would tell Father of the problem.  Mother and the children would leave.  After they left, Father would leave.

(*Id.* at 10-11.)  Although "there were some variations in this pattern, * * * this case presented the longest period of time that children have gone without the children visiting the parent."  (*Id.* at 10-11.)  The magistrate commented that throughout this process the children have been told by Harmony House staff, mother, and Steve that they did not need to visit if they did not want to and that the visitation was the children's decision.  (*Id.* at 10.)

{¶21} The magistrate next described James's attempts to visit the older children at school.  In 2011, Father contacted the principal at the older children's school asking if he could visit J.R. and L.R. at school and indicating that he did not want to disturb the boys or the school.  The visit did not occur.  Subsequently, the Principal talked to Theresa, who told him that "Father was not to have contact with the boys.  Mother was very adamant that Father was not to contact the children and that the school was to contact her if Father attempted to have contact."  (*Id.* at 11.)  Theresa repeatedly instructed the school not to let James have contact with the children.  (*Id.*)  Furthermore, she filed the February 2011 motion for an order prohibiting James from contacting the children at school, in which she alleged that James visited the school and "insisted that the principal release the children to him."  (*Id.*; R. at 88.)  Based on the principal's testimony,

- 12 -

the magistrate found that the claims were unfounded as James "did not insist that the principal release the children, and made no effort to remove the children from school," but behaved cordially, appropriately, and tried not to cause any disturbance in the school schedule. (R. at 232, at 11.)

{¶22} Another situation occurred when James wanted to visit J.R. a day after his birthday in 2011. (*Id.* at 11.) James called the school, then met with J.R. in the school office and gave him a birthday present. (*Id.*) Although the visit went well and J.R. did not display ill effects from the visit while at school after the visit, Theresa reported that "[J.R.] was upset when he got home"; he was crying, had an upset stomach, and was throwing up. (*Id.*) The magistrate further commented that "in the days after the Father's visit and after Mother's call, [J.R.] reported stomach aches and vomiting in the school bathroom, and displayed some anxiety." (*Id.* at 11-12.)

{¶23} On L.R.'s birthday James attempted to visit him at school. "The school guidance counselor encouraged [L.R.] to go into the office to see his father," but "[L.R.] cried, did not go into the room, and said he had to call his mother." (*Id.* at 12.) The magistrate further found that

> Father did not force the visit, apologized to the staff, and left the school. Father left a birthday present for [L.R.]. [L.R.] had no problems for the rest of the school day. At the end of the school day, [L.R.] went to the counselor and asked for the gift. The counselor called Mother after the visit. Mother expressed her concern and left the counselor with the feeling that Mother did not want visits to

> happen. Mother went to the school after the phone call, and talked with [L.R.]'s teacher. Mother testified that [L.R.] came home and went straight to his room. Mother said that after Father's appearance at school, [L.R.] was withdrawn and no longer wanted to participate in extracurricular activities.

(*Id.* at 11-12.) Due to the fact that A.R. "does not really know" James, he did not attempt to visit her at school. (*Id.* at 12.) The magistrate found that James's "actions and communications were consistent with the behaviors and actions of the parent who is supposed to be sharing in the parenting of children." (*Id.* at 22.)

{¶24} J.R. was in counseling during some of the time at issue. The magistrate noted that "[a]t the commencement of counseling, Mother repeated the allegations of physical and sexual abuse of [J.R.] by Father." (*Id.* at 12.) J.R. was afraid of his father, noting two incidents, "one involving a ball bat and another involving a poke in the chest." (*Id.* at 12.) He did not have insight into his reasons for not wanting to visit with James. (*Id.*) Although the counselor generally did not see indications that J.R. was being coached, a manner in which J.R. reported an incident of bed wetting "raised concerns that the child was prompted or coached." (*Id.* at 12.) The counselor was unable to determine whether J.R.'s reported problems with his father were real or imagined. (*Id.* at 12.) She was concerned, however, about forcing J.R. into visitations with James due to J.R.'s expressed fear of the situation. (*Id.* at 13.)

{¶25} Theresa and Steven had apparently talked with the children about James's visitations but indicated that the visitations were the children's decision and they did not intend to force them. (*Id.* at 12.)

{¶26} The magistrate commented that it was "not surprising that the children are reluctant to see Father," as J.R. and L.R. "were of very tender years when their parents separated," and A.R. was not yet born, so she had "no memories of life during her parent's marriage." (*Id.* at 21.) The magistrate referenced "repeated investigations of repeated unfounded allegations," limited contact with the father, and lack of encouragement from the mother that have contributed to the children's reluctance. (*Id.*) The magistrate concluded that the children "have been denied contact with their Father" and they "have been taught to be afraid of their Father." (*Id.* at 28.)

*2010 Tax Return*

{¶27} As a result of the prior court orders, James was entitled to claim J.R. and A.R. as his dependents for 2010 tax year. In spite of this, Theresa filed her 2010 tax return claiming all three children as her dependents. Theresa later explained that it was caused by her tax preparer's mistake. The magistrate found this claim "deceptive" because "[a]t the time the tax preparer was supposedly making a mistake," Theresa's motion asking that the court prohibit James from claiming the children as dependents was pending. (*Id.* at 16-17.) She further

failed to amend her tax return for two months after the magistrate's order denying her motion. (*Id.* at 17.)

*Theresa's Credibility*

**{¶28}** After observing Theresa's demeanor at the hearings, the magistrate concluded that Theresa's credibility was "[a] significant problem in this case." (*Id.* at 13.) The magistrate recognized that Theresa's testimony was "rife with inconsistencies, and either fabrications or serious misinterpretations." (*Id.*) It was "at odds with the testimony of the school administrators," the police officers, and other witnesses. (*Id.*) Therefore, the magistrate did not consider credible Theresa's statements that were "not supported by independent testimony or evidence." (*Id.*)

***Magistrate's Recommendations***

**{¶29}** The magistrate found that it was in the children's best interest to have frequent and continuing contact with both parents. (R. at 232, at 24-25.) Based on the history of Theresa denying James parenting time and her refusal to cooperate and make decisions jointly, shared parenting was no longer in the children's best interest. (*Id.* at 20-22.) Therefore, the magistrate recommended that the shared parenting plan be terminated and James be designated as the residential parent of the children, as that was "the only way to create an opportunity for Father to have contact with the children." (*Id.* at 23.) The

magistrate recommended that Theresa should have "substantial parenting time," from Sunday evening until Friday afternoon during school weeks, and that the children remain in Findlay City Schools. (*Id.* at 4, 32.) The magistrate recommended that Theresa pay child support to James to cover expenses resulting from being the residential parent, but allowed for a deviation from the basic child support schedule. (*Id.* at 27.) Therefore, Theresa was to pay $89.35 per month in child support. (*Id.* at 28.)

**{¶30}** Further, the magistrate recommended that Theresa should be found in contempt of court for denying parenting time to James. (*Id.* at 16.) The magistrate also recommended that Theresa be found in contempt for failure "to amend her 2010 tax return in a timely manner in blatant disregard of the Magistrate's Order issued on March 23, 2011." (*Id.* at 17.) The magistrate gave Theresa opportunities to purge and recommended that she pay $500.00 to James as reimbursement for attorney fees in contempt actions. (*Id.* at 17-18.)

**{¶31}** The magistrate also recommended approval of the guardian ad litem's fees and found that Theresa should be responsible for payment of the fees for six out of seven days of hearing, which were consumed by the presentation of her case. (*Id.* at 29-30.) Additionally, the magistrate recommended that Theresa pay all court costs based on the following findings:

> Plaintiff is in contempt of Court, and should pay all Court costs relating to Defendant's Motions to Show Cause.

Plaintiff initiated these proceedings by seeking transfer from Hardin County, where Defendant still lived, to Hancock County. Plaintiff filed motions requesting extreme relief, including Plaintiff's Motion to Terminate Shared Parenting Plan and to Designate Plaintiff as the Residential Parent and to Terminate or Limit Defendant's Parental Rights, and Plaintiff's Motion for Emergency Order Suspending Defendant's Parenting Time until Court Determination of Residential Parent Status and Request for Hearing. On February 16, 2011, Plaintiff filed a motion based on a falsehood: Plaintiff's Motion for Magistrate's Order to prohibit Defendant from picking up the children from school or child care. Plaintiff filed a Motion for Magistrate's Order relating to tax dependency exemptions while proceeding to violate the prior court orders allocating those tax dependency exemptions. Plaintiff's conduct in this case has prolonged and complicated these proceedings. Plaintiff should pay the Court costs.

(*Id.* at 30-31.)

### *Subsequent Proceedings*

{¶32} After an extension of time, Theresa filed objections to magistrate's decision on October 29, 2012.  (R. at 238.)  Responses were filed and in December 2012, the matter was submitted to the trial court for a ruling on the objections. Rather than ruling on the objections, however, the trial court scheduled additional conferences with the parties on April 17, 2013, June 5, 2013, and July 31, 2013. On July 31, 2013, the trial court filed conference minutes and an order in which it stated that objections to the magistrate's decision remain pending.  (R. at 256.)  No further procedural events are documented in the record until May 2015, when the

trial court issued its fifteen-page decision and order overruling Theresa's objections. (R. at 259.)

{¶33} Three days later, Theresa filed a motion for reconsideration and evidentiary hearing, requesting that the court review additional evidence and testimony regarding the time that has passed since the last court hearing on January 6, 2012 until May 2015. (R. at 260.) She also filed a motion to maintain her as the residential parent and for an evidentiary hearing prior to issuance of final order. (R. at 265.) The trial court issued its final judgment entry on May 27, 2015, adopting the magistrate's recommendations. (R. at 270.) Theresa filed this timely appeal alleging eight assignments of error, as quoted below.

### *Assignments of Error*

#### ASSIGNMENT OF ERROR I

**The Trial Court's award of custody to Appellee was against the manifest weight of evidence and not in the best interest of the minor children.**

#### ASSIGNMENT OF ERROR II

**The Trial Court erred in ordering the Appellant to pay child support to the Appellee when the children primarily reside with the Appellant and the Appellant has the primary responsibility for the care, sustenance and support of the minor children.**

#### ASSIGNMENT OF ERROR Ill

**The Trial Court erred in finding the Appellant in contempt for a denial of parenting time to Appellee.**

## ASSIGNMENT OF ERROR IV

**The Trial Court erred in finding the Appellant in contempt for claiming one of the minor children as a dependent when the Appellant contacted her tax preparer, notified her tax preparer, and filed an amended return.**

## ASSIGNMENT OF ERROR V

**The Trial Court erred in approving Guardian Ad Litem fees for no evidence or testimony was presented to establish that the fees were fair and reasonable. In addition, the Trial Court erred in ordering a disproportionate division of the fees between the parties.**

## ASSIGNMENT OF ERROR VI

**The Trial Court erred as a result of its failure to appoint an attorney to represent the interests of the minor children when the wishes of the children were at odds with the recommendations of the Guardian Ad Litem.**

## ASSIGNMENT OF ERROR VII

**The Trial Court erred as a result of its failure to issue a ruling upon objections for a period of more than three years from the filing of the magistrate's decision. Further, the Trial Court erred in not scheduling an evidentiary hearing upon the issue of changes in circumstances that had occurred during the three year period of time that followed the magistrate's decision.**

## ASSIGNMENT OF ERROR VIII

**The Trial Court erred as a result of its ordering that the Appellant pay all court costs incurred in the proceedings.**

*Analysis*

***First Assignment of Error—Allocation of Parental Rights and Responsibilities***

**{¶34}** Theresa complains about the trial court's designation of James as the residential parent of the children upon terminating the parties' shared parenting plan. She asserts that the decision was against the manifest weight of the evidence and not in the best interest of the minor children.

**{¶35}** When terminating a shared parenting plan and issuing a new decree for allocation of parental rights and responsibilities, the trial court must consider the best interest of the children under the factors outlined in R.C. 3109.04(F)(1). These factors include:

> (a) The wishes of the child's parents regarding the child's care;
>
> (b) If the court has interviewed the child in chambers pursuant to division (B) of this section regarding the child's wishes and concerns as to the allocation of parental rights and responsibilities concerning the child, the wishes and concerns of the child, as expressed to the court;
>
> (c) The child's interaction and interrelationship with the child's parents, siblings, and any other person who may significantly affect the child's best interest;
>
> (d) The child's adjustment to the child's home, school, and community;
>
> (e) The mental and physical health of all persons involved in the situation;
>
> (f) The parent more likely to honor and facilitate court-approved parenting time rights or visitation and companionship rights;

(g) Whether either parent has failed to make all child support payments, including all arrearages, that are required of that parent pursuant to a child support order under which that parent is an obligor;

(h) Whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any criminal offense involving any act that resulted in a child being an abused child or a neglected child; whether either parent, in a case in which a child has been adjudicated an abused child or a neglected child, previously has been determined to be the perpetrator of the abusive or neglectful act that is the basis of an adjudication; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to a violation of section 2919.25 of the Revised Code or a sexually oriented offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding; whether either parent or any member of the household of either parent previously has been convicted of or pleaded guilty to any offense involving a victim who at the time of the commission of the offense was a member of the family or household that is the subject of the current proceeding and caused physical harm to the victim in the commission of the offense; and whether there is reason to believe that either parent has acted in a manner resulting in a child being an abused child or a neglected child;

(i) Whether the residential parent or one of the parents subject to a shared parenting decree has continuously and willfully denied the other parent's right to parenting time in accordance with an order of the court;

(j) Whether either parent has established a residence, or is planning to establish a residence, outside this state.

R.C. 3109.04(F)(1). The court is required to consider all other relevant circumstances in making its determination. *See* R.C. 3109.04(F)(1).

{¶36} The trial court's determination of what is in the best interest of the child will not be reversed absent an abuse of discretion. *Errington v. Errington*, 3d Dist. Wyandot No. 16-01-17, 2002-Ohio-1419, *2. This standard requires that the trial court's reasoning not be disturbed unless it was "unreasonable, arbitrary or unconscionable," because the trial judge is best equipped to determine and weigh the credibility of the proffered testimony. *Davis v. Flickinger*, 77 Ohio St. 3d 415, 416, 418, 674 N.E.2d 1159 (1997); *Blakemore v. Blakemore*, 5 Ohio St. 3d 217, 219, 450 N.E.2d 1140 (1983).

{¶37} In the case at issue, the magistrate and the trial court reviewed the factors of R.C. 3109.04(F)(1) listed above and specifically noted the following. Each parent wanted to be named the residential parent—factor (a); the children did not have sufficient reasoning ability to express their wishes—factor (b); the children had strong ties to Theresa and Steven and did not have strong ties to James and Naomi—factor (c); the children had strong historical and family ties to Northwest Ohio and did well in Findlay City Schools, benefiting from special school programs that have been tailored to their needs—factor (d); no mental or physical issues of the parents were noted, but the children's special needs were recognized—factor (e); James was more likely to honor and facilitate court-approved parenting time—factor (f); "child support arrearages" were not significant as James "substantially complied" with his child support obligations—

factor (g); neither parent had a history of neglect or abuse of a child, contrary to Theresa's unsubstantiated allegations against James—factor (h); Theresa had "a long history of keeping the children from Father"—factor (i); neither parent has established or planned to establish a residence outside the state—factor (j). (R. at 232, at 5, 13, 19-21.) The magistrate and the trial court recognized that the guardian ad litem recommended father to be named as residential parent. (*See id.* at 21.)

**{¶38}** Relying on applicable case law, the magistrate found factors (f) and (i) particularly relevant to the determination of the children's best interest. The magistrate cited a case from the Twelfth District Court of Appeals, which reversed the trial court's designation of mother as the residential parent based on her interference with father's visitation time. (*Id.* at 24, citing *In re D.M.*, 196 Ohio App.3d 50, 2011-Ohio-3918, 962 N.E.2d 334, ¶ 37 (12th Dist.).) That court held:

> We find that it was arbitrary for the juvenile court to grant custody of D.M. to the mother, a parent (1) who has repeatedly denied the father his parenting time, (2) who was twice found in contempt by the juvenile court for denying the father's parenting time on ten occasions in the span of a year (July 2009 to July 2010), (3) who is determined to interfere with the father's parenting time as noted by the GAL in her second report, (4) who has in fact interfered with the father's parenting time and whose interference has caused great distress to the child, as reported by the GAL in her second report, and (5) who, in the juvenile court's own words, "has demonstrated repeatedly her unwillingness to not only cooperate with the father concerning his relationship and parenting time with the child, but her unwillingness to cooperate with this Court's Orders."

*In re D.M.* at ¶ 35. In its reasoning the Twelfth District Court of Appeals recognized that "the mother has been the primary caregiver of the child since he was born," but refused to give this factor " 'presumptive weight over other relevant factors.' " *Id.* at ¶ 29, quoting *Terry L. v. Eva E.*, 12th Dist. Madison No. CA2006-05-019, 2007-Ohio-916, ¶ 17. Instead, that court relied on the children's right to "love each parent" and the "need for parenting by both parents." *Id.* at ¶ 30, 34, quoting *Davis v. Flickinger*, 77 Ohio St.3d 415, 419, 1997-Ohio-260, 674 N.E.2d 1159 (1997), *and In re Custody of Harris*, 168 Ohio App.3d 1, 2006-Ohio-3649, 857 N.E.2d 1235, ¶ 11 (2d Dist.). Similarly, the Ohio Supreme Court held that "[w]hen one parent begins to cut out another parent, especially one that has been fully involved in that child's life, the best interest of the child *is* materially affected." (Emphasis sic.) *Davis* at 419.

{¶39} Theresa argues that the trial court's findings regarding her interference with parenting time are against the manifest weight of the evidence. The manifest weight of the evidence "refers to a greater amount of credible evidence and relates to persuasion." *Eastley v. Volkman*, 132 Ohio St.3d 328, 2012-Ohio-2179, 972 N.E.2d 517, ¶ 19 (2012). Under this standard, the reviewing court "does not reweigh the evidence," but it applies the presumption that the findings of the trier of fact are correct. *Southeast Land Dev., Ltd. v. Primrose Mgt. L.L.C.*, 193 Ohio App.3d 465, 2011-Ohio-2341, 952 N.E.2d 563, ¶ 7 (3d

Dist.); *Drummer v. Drummer*, 3d Dist. Putnam No. 12-11-10, 2012-Ohio-3064, ¶ 7. "Mere disagreement over the credibility of witnesses or evidence is not sufficient reason to reverse a judgment." *Drummer* at ¶ 7; citing *State v. Wilson,* 113 Ohio St.3d 382, 865 N.E.2d 1264, 2007-Ohio-2202, ¶ 40. Therefore, "a judgment supported by some competent and credible evidence will not be reversed by a reviewing court as being against the manifest weight of the evidence." *Lambert v. Merrick, Inc.*, 3d Dist. Hancock No. 5-92-11, 1992 WL 209298, *2 (Aug. 31, 1992).

{¶40} In the instant case, the record supports the magistrate and the trial court's finding that Theresa defied the court's orders, denied James parenting time, and engaged in deceptive tactics to prevent him from having any contact with his children. In addition to the examples noted by the magistrate in his findings of fact, the record is replete with examples of Theresa's actions and statements that impeded James's ability to engage in meaningful contact with his children. (*See, e.g.*, Tr. at 96, 102-103, 113, 1284 (making repeated unsupported allegations to counselors and staff at Harmony House about sexual abuse or emotional abuse of the children); 382, 384, 385 (repeatedly instructing the school principal that James was not to have any contact with the children at school); Tr. at 905, Ex. W (indicating that Theresa listed Steve in children's school papers, while excluding James and stating that she had sole custody of the child); Tr. at 1284,

1327 (indicating "constantly" to the counselor that she did not want James to be around the children).) Her actions of filing motions to prevent James from picking up children from school and to terminate his parenting rights, are in contravention to her assertions that she did not prevent James from seeing the children and that she encouraged the children's relationship with him. Theresa effectively blocked James from the children's lives, estranging them from him to the point where A.R. did not believe he was her father; J.R. told the school's principal that he "would not be allowed" to have lunch with James; and the children called Steve "Dad." (*See, e.g.*, Ex. 9 at 7; Tr. at 120-121; 367.) Because the findings of the court below regarding Theresa's wrongdoing and lack of credibility are well-supported by the record, we reject her contentions that the trial court's decision was against the manifest weight of the evidence.

{¶41} Theresa points to the fact that "the children are bound" with her and Steven, while James "is not, and has not been, actively involved in any aspect of the children's lives since at least the year 2009." (App't Br. at 17.) Based on the magistrate's findings, approved by the trial court and supported by the record, the fact that the children are bound with Theresa and Steven and have no relationship with James is due to Theresa's wrongdoing. The trial court's decision aims to correct that wrongdoing and afford the children a frequent and continuing contact

with both parents, which according to the law and the record before us, is in the children's best interest.

**{¶42}** The findings of the magistrate and the trial court are not against the manifest weight of the evidence and support the decision that award of custody to James is in the children's best interest. Therefore, Theresa's first assignment of error is overruled.

### *Assignments of Error II, III, IV, V, and VIII—Lack of Support*

**{¶43}** The second, third, fourth, fifth, and eighth assignments of error are addressed together due to the same standard that guides their resolution. App.R. 16(A)(7) requires that an appellant include in his or her brief: "An argument containing the contentions of the appellant with respect to each assignment of error presented for review and the reasons in support of the contentions, *with citations to the authorities, statutes, and parts of the record on which appellant relies*." (Emphasis added.) "It is not the duty of an appellate court to search the record for evidence to support an appellant's argument as to any alleged error." *Rodriguez v. Rodriguez*, 8th Dist. Cuyahoga No. 91412, 2009-Ohio-3456, ¶ 7. Rather, "an appellate court may disregard an assignment of error pursuant to App.R. 12(A)(2): 'if the party raising it fails to identify in the record the error on which the assignment of error is based or fails to argue the assignment separately

in the brief, as required under App.R. 16(A).' " *Id.* at ¶ 4, quoting App.R. 12(A)(2).

**{¶44}** In the second assignment of error Theresa complains about the award of child support to James and submits a one-paragraph "argument" that lacks any legal support or references to the record. Similarly, assignments of error three and four, which challenge the trial court's findings of contempt, lack proper support and consist of restating Theresa's claims that were found not credible in the trial court. The fifth assignment of error includes a complaint about the amount of guardian ad litem's fees and a "disproportionate division" of the fees between the parties. No support is offered for Theresa's claims that the fees were unreasonable or that they should have been divided equally between the parties. In the eighth assignment of error Theresa claims that "[t]here exists no basis within the Trial Court's Decision as to why the appellant is required to bear the entire court costs of these proceedings." (App't Br. at 24.) This claim is contradicted by the quoted-above reasoning of the magistrate, as approved by the trial court, detailing the reasons for imposing costs on Theresa. (*See* R. at 232, at 30-31.) Additionally, Theresa fails to support her three-sentence "argument" in this assignment of error with any authorities or citations to the record.

**{¶45}** We thus decline to find an error on the part of the trial court, as alleged in the second, third, fourth, fifth, and eighth assignments of error, when

these errors are not properly argued on appeal. *See Rodriguez* at ¶ 7 (" 'An appellate court is not a performing bear, required to dance to each and every tune played on an appeal.' "), quoting *State v. Watson*, 126 Ohio App.3d 316, 321, 710 N.E.2d 340 (12th Dist.1998).

**{¶46}** We note, however, that no errors prejudicial to Theresa are apparent from the record. The trial court is vested with discretion in determining matters of child support, allocation of court costs, finding of contempt, and approving and dividing guardian ad litem's fees. *See August v. August*, 3d Dist. Hancock No. 5-13-26, 2014-Ohio-3986, ¶ 20 (award of child support); *Walker v. Walker*, 3d Dist. Marion No. 9-12-15, 2013-Ohio-1496, ¶ 38 (contempt); *Strauss v. Strauss*, 8th Dist. Cuyahoga No. 95377, 2011-Ohio-3831, ¶ 76 (guardian ad litem's fees); *Nithiananthan v. Toirac*, 12th Dist. Warren Nos. CA2014-02-021, CA2014-02-028, CA2014-08-114, 2015-Ohio-1416, ¶ 89 (allocation of court costs). Therefore, we will not reverse the trial court's decision in these matters unless we find it contrary to law, unreasonable, not supported by the evidence, or grossly unsound. *Muckensturm v. Muckensturm*, 3d Dist. Hancock No. 5-11-38, 2012-Ohio-3062, ¶ 16; *Bruce v. Bruce,* 3d Dist. Marion No. 9-10-57, 2012-Ohio-45, ¶ 13. The record sufficiently supports the magistrate and the trial court's findings on the issue of child support, contempt, and allocation of fees and costs.

**{¶47}** Therefore, Theresa's contentions in the second, third, fourth, fifth, and eighth assignments of error are not well taken and these assignments of error are overruled.

***Sixth Assignment of Error—Request for Separate Counsel for the Children***

**{¶48}** In the sixth assignment of error Theresa cites an Ohio Supreme Court opinion for a proposition that the magistrate was required to appoint an attorney to represent the interests of the minor children because the children's wishes "were at odds with the recommendations of the Guardian Ad Litem." (App't Br. at 23, citing *In re Williams*, 101 Ohio St.3d 398, 2004-Ohio-1500, 805 N.E.2d 1110. In *Williams*, the Ohio Supreme Court was asked to determine "when a juvenile court must appoint counsel for a child who is the subject of a proceeding *to terminate parental rights*." (Emphasis added.) *Id.* at ¶ 1. The *Williams* court focused its inquiry around R.C. 2151.352, which provides for a right to counsel "at all stages of the proceedings under this chapter or Chapter 2152. of the Revised Code." *Id.* at ¶ 13, quoting R.C. 2151.352. Unlike *Williams*, this case does not involve termination of parental rights or Chapters 2152 and 2151 of the Revised Code. Thus, the reasoning used by the Ohio Supreme Court in *Williams* does not apply here. *See also Jennings-Harder v. Yarmesch*, 8th Dist. Cuyahoga No. 83984, 2004-Ohio-3960, ¶ 19 (holding that the parties' reliance on *Williams* in a proceeding to modify parental rights was "somewhat misguided" because the Ohio

Supreme Court "did not decide that a child is always entitled to independent counsel").

**{¶49}** Civ.R. 75(B)(2), which governs "Divorce, annulment, and legal separation actions," states that "[w]hen it is essential to protect the interests of a child, the court *may* join the child of the parties as a party defendant and appoint a guardian ad litem and legal counsel, if necessary, for the child and tax the costs." (Emphasis added.) This rule "does not require the court to appoint counsel for the children in every case where there is conflict between the children's wishes and the guardian ad litem's assessment of their best interest." *O'Malley v. O'Malley*, 8t Dist. Cuyahoga No. 98708, 2013-Ohio-5238, ¶ 51. Rather, it is up to the trial court's discretion whether to appoint counsel for children. *Id.* at ¶ 50.

**{¶50}** We find no abuse of discretion in the denial of Theresa's motion for separate counsel for the children where nothing indicates that the guardian ad litem failed to protect the children's interests. *See id.* at ¶ 51 (finding that there was no need to appoint separate counsel for the children were "the children's interests were sufficiently protected by the guardian ad litem"). The guardian ad litem submitted thorough reports, in which she disclosed that the children wished to stay with their mother. Further, after talking with the children, the magistrate determined that they did not have independent reasoning ability to express their wishes with respect to the allocation of parental rights and responsibilities.

{¶51} For all of the foregoing reasons, we overrule the sixth assignment of error.

*Seventh Assignment of Error—Delay in Ruling on Objections*

{¶52} In this assignment of error, Theresa complains about the three-year delay in ruling on her objections to the magistrate's decision and the trial court's failure to hold a new evidentiary hearing due to the alleged change in circumstances that had occurred during these three years. Once again Theresa fails to support her claim with any legal argument or citations to the record.

{¶53} Several of our sister appellate districts have been presented with similar arguments. For example, the Second District Court of Appeals called a two-year delay between the magistrate's decision and the trial court's judgment adopting the decision "considerable." *Hall v. Hall*, 2d Dist. No. 2013 CA 15, 2013-Ohio-3758, ¶ 34. It refused, however, to reverse the trial court's decision on this basis because the defendant "failed to establish that he was prejudiced in any way." *Id.* The court further noted that the defendant "could have filed a writ with this Court asking us to compel the trial court to rule on the objections." *Id.* His failure to avail himself of such a remedy undermined his claim of prejudice. *Id.*; *see also Toliver v. Duwel*, 2d Dist. Montgomery No. 24768, 2012-Ohio-846, ¶ 96 (refusing to reverse the trial court's decision based on a delay where the appellant failed to point to any prejudice and failed to avail herself of the remedy of a writ

of procedendo). Likewise, the Ninth District Court of Appeals recognized that a delay of more than fifteen months was "uncommonly lengthy under the circumstances." *Friess v. Hague*, 9th Dist. Lorain No. 96CA006518, 1997 WL 460163, *2 (Aug. 6, 1997). It refused, however, to reverse the trial court's judgment absent a showing of prejudice by the appellant. *Id.* Due to the appellant's failure to move the trial court to rule upon his objections, the court found that he acquiesced in the delay, which supported the "conclusion he was not prejudiced by it." *Id. See also State ex rel. Scioto Cty. Child Support Enforcement Agency v. Adams*, 4th Dist. Scioto No. 98CA2617, 1999 WL 597257, *9 (July 23, 1999) (rejecting an argument that a sixteen-month delay before the magistrate issued its decision constituted a violation of due process where there was no prejudice to the appellant resulting from the delay and the appellant failed to file "a petition for a writ of procedendo to remedy the magistrate's failure to timely reach a decision").

{¶54} This case is similar to *Hall*, *Toliver*, *Friess*, and *Adams*. Theresa fails to show prejudice from the delay, and her failure to file a writ of procedendo shows her acquiescence to the delay, which undermines her claim of prejudice. In fact, we recognize that the delay in this case was beneficial to Theresa's interests, as it delayed an implementation of the judgment that was unfavorable to her.

Theresa fails to point to any law or evidence in the record that would require a reversal based on the trial court's failure to conduct an additional hearing.[1]

**{¶55}** While we do not approve of a three-year delay in rendering a judgment by the trial court, we refuse to find error prejudicial to Theresa and we overrule the seventh assignment of error.

### Conclusion

**{¶56}** Having reviewed the arguments, the briefs, and the record in this case, we find no error prejudicial to Appellant in the particulars assigned and argued. The judgment of the Common Pleas Court of Hancock County, Ohio, Domestic Relations Division is therefore affirmed.

*Judgment Affirmed*

**SHAW and PRESTON, J.J., concur.**

**/hlo**

---

[1] Nothing in this decision precludes Theresa from filing a motion for modification based on a change in circumstances under R.C. 3109.04, and supporting it by new evidence in the trial court.