[Cite as *Kapp v. Kapp*, 2019-Ohio-4097.]

**IN THE COURT OF APPEALS OF OHIO
SECOND APPELLATE DISTRICT
CLARK COUNTY**

TYLER M. KAPP

    Plaintiff-Appellee

v.

JESSICA L. KAPP

    Defendant-Appellant

:
:
:
:
:
:
:
:
:
:
:
:

Appellate Case No. 2018-CA-133

Trial Court Case No. 2017-DR-881

(Domestic Relations Appeal)

. . . . . . . . . . .

O P I N I O N

Rendered on the 4th day of October, 2019.

. . . . . . . . . . .

STACEY R. PAVLATOS, Atty. Reg. No. 0012392, 700 E. High Street, Springfield, Ohio 45505
    Attorney for Plaintiff-Appellee

VALERIE JUERGENS WILT, Atty. Reg. No. 0040413, 333 North Limestone Street, Suite 202A, Springfield, Ohio 45503
    Attorney for Defendant-Appellant

. . . . . . . . . . . .

HALL, J.

{¶ 1} Jessica L. Kapp appeals from the trial court's judgment entry and divorce decree that, among other things, terminated her marriage to appellee Tyler Kapp, divided assets and liabilities, and ordered shared parenting of the parties' two children.

{¶ 2} Jessica advances eight assignments of error in which she "appeals virtually every Order of the trial court[.]"[1] (Appellant's brief at 8.) First, she contends the trial court erred in calculating the value of her share of two family-owned self-storage businesses. Second, she claims the trial court erred in finding that a 2007 Honda Odyssey minivan was Tyler's separate property. Third, she argues that the trial court erred in awarding Tyler a 2005 Hornet travel trailer as his separate property. Fourth, she challenges the trial court's finding that a $30,000 down payment for the marital residence was Tyler's separate property. Fifth, she asserts that the trial court erred in allocating Tyler's 401(k) account. Sixth, she maintains that the trial court erred in refusing to require Tyler or the two self-storage companies to pay some of her attorney fees. Seventh, she contends the trial court erred in ordering shared parenting. Eighth, she claims the trial court erred in failing to award her child support.

{¶ 3} The record reflects that the parties married in April 2011. During the marriage, they had two children who were born in 2011 and 2014. Each party separately filed for divorce in September 2017, and the matter proceeded on Tyler's complaint. After hearing eight days of testimony, the trial court filed a November 21, 2018 judgment entry and decree of divorce. As relevant here, it ordered shared parenting of the children and declined to award Jessica any child support. It also found that the 2007 minivan, the 2005 travel trailer, and the $30,000 down payment for the marital residence were gifts to Tyler

---

[1] For purposes of clarity, we will refer to the parties by their first names.

from his father during the marriage. As a result, it awarded Tyler the travel trailer and $30,000 of home equity as his separate property. The trial court awarded the minivan to Jessica but granted Tyler a monetary credit for its value. With regard to Tyler's 401(k) account, the trial court found Jessica entitled to "her coverture share of these monies which accrued during the tenure of the parties' marriage plus her covertured share of any gains or losses which accrue until distribution[.]" The trial court additionally found that Jessica's ownership interest in two self-storage businesses had a negative discounted present value. As a result, it awarded that interest to Tyler without any compensation to Jessica. Finally, the trial court declined to order Tyler or the self-storage businesses to pay any of Jessica's attorney fees.

{¶ 4} Having reviewed the record, which includes eight volumes of hearing transcripts, we turn to Jessica's first assignment of error. Therein, she challenges the trial court's valuation of her interest in the two self-storage businesses. The record reflects that the businesses were limited-liability companies known as Home Road Self Storage ("Home Road") and Key and Lock of Enon ("Key and Lock"). Tyler and Jessica each owned a 25 percent interest in the companies as did Tyler's sister and her husband, who likewise each had a 25 percent interest. At trial, Tyler presented expert testimony from certified appraiser James Horner regarding the value of the real estate owned by the two companies and Jessica's interest therein.[2] Horner prepared separate appraisal reports

---

[2] The primary asset of the two limited-liability companies was the real estate that included the self-storage facilities. Horner clarified that his appraisal was of real estate (i.e., the storage facilities), and it did not include any personal property or cash held by the companies. (March 7, 2018 Tr. at 49.) Although Horner technically appraised the real estate owned by the companies rather than the companies themselves, will refer to Horner's work as an appraisal of the businesses Home Road and Key and Lock. We will do so for ease of reference while remaining cognizant of the distinction.

for Home Road and Key and Lock. (Plaintiff's Trial Exh. 1, 3.) He determined that the fee simple market value of Home Road was $920,000. He reached this conclusion after evaluating an income-capitalization approach and a sales-comparison approach to value. (Plaintiff's Exhibit 1 at 23-25.) With regard to Key and Lock, Horner determined that its fee simple market value was $523,500. He again reached this conclusion after evaluating an income-capitalization approach and a sales-comparison approach to value. (Plaintiff's Exhibit 3 at 23-25.) In both instances, Horner adopted the income-capitalization approach to value, but the value was similar under either method.

{¶ 5} After determining the market value of both companies, Horner testified that the undiscounted value of Jessica's share of Home Road was simply 25 percent of $920,000, which would be $230,000. (March 7, 2018 Tr. at 52-53; Plaintiff's Exhibit 65.) He similarly testified that the undiscounted value of Jessica's share of Key and Lock was 25 percent of $523,500, which would be $130,875. (*Id.* at 61; Plaintiff's Exh. 66.) Horner then explained that it was necessary to "discount" the value of Jessica's interest in the companies. He testified that a discount was required primarily to account for her lack of control and for impaired marketability of her minority interest in a private business that imposed restrictions on transferring her shares. (March 7, 2018 Tr. at 53-57.) He also noted that the companies' operating agreements precluded current distributions of cash flow. (*Id.* at 55.) Horner explained that discounts frequently range from 25 to 45 percent. (*Id.*) In the present case, he "selected the medium range of 35 percent." (*Id.*) Applying a 35 percent discount to Jessica's interest in Home Road, Horner determined that her interest had a market value of $149,500. (*Id.* at 58-59.) With regard to Key and Lock, Horner determined that the discounted market value of Jessica's interest was $85,075.

(*Id.* at 62.) Notably, however, these discounted market values did not account for or consider existing financing debt on both properties. (*Id.* at 59, 62.) When Horner appraised the properties, he determined their market value free and clear of all debt. (March 7, 2018 Tr. at 50.) He did the same when determining the discounted market value of Jessica's interest. (*Id.* at 59, 62.)

{¶ 6} The central issue on appeal concerns the proper way to account for sizeable debt on the properties. In its ruling, the trial court allocated 25 percent of the mortgage debt on each property to Jessica's corresponding 25 percent interest in the property. It subtracted that mortgage debt from the discounted market value of her 25 percent interest, while also crediting her with her pro rata share of the two companies' cash. The trial court explained its computations as follows:

> The Court finds, from the totality of the credible evidence, that Ms. Kapp's one-fourth interest in the fair market value of [Home Road] is valued at $149,500, with a 35% lack of marketability discount. That value is subject to a mortgage indebtedness for her interest in the sum of $150,463.00, thereby yielding a negative value at this point of $963.00. The business also currently has cash on hand in the sum of $10,905.00, which represents her one-fourth discounted interest in cash on hand. Therefore, the Court finds that Ms. Kapp has a one-fourth discounted interest in this business worth $9,942.00.
>
> The Court further finds, from the totality of the credible evidence, that with respect to the Key and Lock of Enon LLC, Ms. Kapp's discounted one-fourth gross interest has a fair market value of $85,075.00 and that it is

subject to a mortgage indebtedness in the sum of $97,138.00, as it relates to Ms. Kapp. It is also subject to an indebtedness as it relates to her in the sum of $22,758.00, thereby resulting in a negative discounted value of $34,821.00. There is $8,596.00 in cash on hand which represents her one-fourth discounted value. Therefore, Ms. Kapp has a one-fourth reduced ownership interest in this business which has a negative value of $26,225.00. In summary, the Court finds that Ms. Kapp's interest in these businesses has a negative value of $16,283.00 when combined. In consideration of the foregoing, it is fair and equitable to obligate Ms. Kapp to assign to Mr. Kapp all of her interest in Kay and Lock of Enon LLC and Home Road Self-Storage LLC without any special compensation and it is equitable to obligate Mr. Kapp to pay and save Ms. Kapp harmless from all debts and expenses relating to the subject businesses.

(Doc. # 47 at 22.)

{¶ 7} We review a trial court's valuation of property in divorce proceedings for an abuse of discretion. *Fitzgerald v. Fitzgerald*, 2d Dist. Darke No. 2015-CA-18, 2016-Ohio-37, ¶ 47; *Cronin v. Cronin*, 2d Dist. Greene Nos. 02-CA-110, 03-CA-75, 2005-Ohio-301, ¶ 11. A trial court abuses its discretion by making a decision that is unreasonable. *Bass v. Bass*, 2d Dist. Montgomery No. 28217, 2019-Ohio-2746, ¶ 24. An unreasonable decision is one not supported by a sound reasoning process. *Id.*

{¶ 8} On appeal, Jessica contends the trial court abused its discretion by subtracting an *undiscounted* 25 percent of the mortgage debt from the *discounted* value of her 25 percent interest in the companies. Jessica asserts that the trial court erred in

adopting this "convoluted" and "bizarre" methodology that no expert witness endorsed. (Appellant's brief at 12-13.) In contrast to the trial court's approach, Jessica argues that it first should have determined the net market value of her interest by subtracting all debt from Horner's appraised market value of the properties. She asserts that the result then should have been divided by four to determine the market value of her interest, which then should have been discounted by 35 percent. According to Jessica, if this methodology had been followed, the discounted market value of her interest in the two companies would be nearly $80,000. (Appellant's brief at 15-16.)

{¶ 9} The difference in the trial court's approach and Jessica's approach is best illustrated in Plaintiff's Exhibits 65 and 66. The first column of Exhibit 65 shows that the appraised market value of Home Road, minus mortgage debt, plus cash on hand, equals $385,259. Under Jessica's approach, her 25 percent interest is reflected in column two, which shows a value of $96,314. She would discount the $96,314 by 35 percent, leaving her interest with a market value of approximately $62,604. With regard to Key and Lock, the first column of Exhibit 66 reflects that the appraised market value, minus mortgage debt, plus cash on hand, equals $96,889. Under Jessica's approach, her 25 percent interest is reflected in column two, which shows a value of $24,223. She would discount the $24,223 by 35 percent, leaving her interest with a market value of $15,745. Applying Jessica's approach to the figures on Exhibits 65 and 66 would give her 25 percent interest in the two companies an aggregate market value of approximately $78,349.

{¶ 10} The trial court's valuation approach is reflected in column three on Exhibits 65 and 66. Exhibit 65 shows Home Road's appraised value of $920,000 not factoring in debt. Jessica's 25 percent interest accordingly is worth $230,000. In column three, the

$230,000 value of Jessica's interest is discounted 35 percent, resulting in a value of $149,500. Twenty-five percent of the mortgage debt on Home Road, or $150,463, is then subtracted from $149,500, leaving a value of -$963. The discounted value of Jessica's share of Home Road's cash, $10,905, is then added in, resulting her 25 percent interest having a market value of $9,942.[3] In Exhibit 66, the same calculations are performed for Key and Lock. Specifically, the appraised value of $523,500 is divided in four, resulting in Jessica's 25 percent interest having a value of $130,875. That figure is discounted 35 percent, resulting in a value of $85,075. Twenty-five percent of the mortgage debt, or $119,896, is then subtracted from $85,075, leaving a value of -$34,821. The discounted value of Jessica's interest in the company's cash, $8,596, is added to that figure, resulting in her 25 percent interest having a market value of -$26,225. Using these calculations, the aggregate value of Jessica's interest in the two companies is -$16,283.

{¶ 11} It is readily apparent that the difference between Jessica's calculations and the trial court's is that her approach discounts the mortgage debt whereas the trial court's approach does not. The trial court took the discounted value of Jessica's 25 percent interest in Home Road and Key and Lock and subtracted 25 percent of the full, undiscounted debt on the properties. The result was a negative value. Jessica instead subtracted the full, undiscounted debt from the appraised market value of the properties before discounting the result by 35 percent and dividing by four to arrive at her value. In so doing, she necessarily discounted both the market value of her interest in the

---

[3] Jessica's interest in the cash was discounted because there were restrictions on distributions and she did not control its use. (*See* Horner testimony, March 7, 2018 Tr. at 56.)

properties and the debt.[4]

{¶ 12} It is not clear to us, however, why the debt should be discounted. Appraiser Horner explained why it was necessary to discount the market value of Jessica's 25 percent interest in Home Road and Key and Lock. Most significantly, the value of her minority interest in the two companies is impaired by a lack of marketability or control. To determine what a buyer would pay for her share of the companies, Horner had to consider these impairments, which reduce the market value of what Jessica owns. The same is not true for the mortgage debt. Marketability or control issues impact the value of Jessica's interest in the companies, but such issues have no impact on the companies' debt. No lender would reduce the existing mortgage debt by 35 percent in recognition of the discount applied to Jessica's ownership interest in the companies. As a practical matter, then, a prospective purchaser would be buying Jessica's discounted ownership interest, which remains encumbered by the full, undiscounted pro rata share of the companies' debt.[5] There may be some explanation for discounting the debt in this case, but it is not

---

[4] A hypothetical illustration using round numbers and applying a 50 percent discount makes clear that Jessica discounted the debt on the properties. Suppose the full market value of her share of the companies was $100,000 and that her share of the debt they carried was $50,000. For ease of computation, suppose also that a 50 percent discount rate applied. Under her approach, Jessica would subtract the debt from the market value, leaving a net market value of $50,000, which she then would discount by 50 percent, leaving her share with a value of $25,000. The same result is obtained by separately applying the 50 percent discount to the full market value of her share and applying the 50 percent discount to her share of the debt, and then subtracting the discounted debt from the discounted market value (i.e., discounted market value of $50,000 minus discounted debt of $25,000 equals a current market value of $25,000 for Jessica's share of the companies). Thus, by subtracting the debt from the market value and then discounting the result, Jessica discounted the debt.

[5] On appeal, Jessica stresses that she has no personal liability for the mortgage debt at issue. (Appellant's brief at 13-14.) The fact remains, however, that the limited-liability companies of which she is a 25-pecent owner are encumbered by substantial debt. Therefore, in determining the value of those companies, their debt must be considered.

found in the record before us.[6] Therefore, we cannot say the trial court erred in failing to adopt Jessica's valuation approach.

{¶ 13} Despite the foregoing conclusion, we agree with Jessica that the trial court acted unreasonably in assigning no positive actual value to her 25 percent interest in the two companies. The record reflects that Home Road and Key and Lock are successful and profitable businesses. The undiscounted net market value of the two businesses, after subtracting their debt, is roughly half a million dollars. (Plaintiff's Exhibits 65-66.) Certified public accountant Mike Fissel testified that Home Road was projected to have free cash flow of $20,518.86 over the upcoming year after servicing its debt and making one-time capital expenditures of $48,000 for needed repairs. (March 7, 2018, Tr. at 125-126.) The Key and Lock property was projected to have free cash flow of $3,379 after debt service. (*Id.* at 129.) But an anticipated capital expenditure for driveway resealing was expected to reduce free cash flow to negative $1,621 for the upcoming year. (*Id.*) In any event, the two businesses together easily were cash-flow positive after all debt servicing and capital expenditures. In addition, based on a current accelerated debt-repayment schedule, the Home Road property, which itself appraised for $920,000, is expected to be mortgage free by December 2026. (*Id.* at 138-140; Defendant's Exh. NN-1.) Paying off the mortgage will allow the company to retain an additional $6,841.43 per

---

[6] Jessica does cite case law in which an expert seems to have followed her valuation approach without explanation. *See, e.g., Bohme v. Bohme*, 2d Dist. Montgomery No. 26021, 2015-Ohio-339, ¶ 27. She also cites the testimony of certified public accountant Mike Fissel in this case. Fissel testified about calculating the "book value" of Home Road and Key and Lock. But he did not address how to deal with the discounting issue, and he more specifically did not address whether or why the debt encumbering Jessica's share of the companies should be discounted. (July 30, 2018 Tr. at 104-109.)

month based on the current payment schedule. (Defendant's Exh. NN-1.) In short, the record establishes that relatively soon the two companies, which currently are paying for themselves, together will have equity in excess of one million dollars and will be generating substantial free cash flow. We find it unreasonable to conclude that Jessica's 25 percent ownership interest in this enterprise is worthless and, in fact, is worth less than zero.

{¶ 14} The apparent value of Jessica's interest is reflected in the fact that both she and Tyler desire ownership of it. Jessica testified at trial that if she were not awarded at least "book value" for her interest in the two companies, then she would prefer to keep her interest. (August 17, 2018 Tr. at 61-62.) At trial, the companies' accountant, CPA Fissel, determined that the book value of Home Road was $97,533.60, and the book value of Key and Lock was $81,446.66. (July 30, 2018 Tr. at 112, 115-117.) The combined book value of these businesses was $178,980.26. Jessica's attorney calculated that 25 percent of the combined book value was $44,744.92.[7] (August 17, 2018 Tr. at 62.) Jessica testified that she was agreeable to transferring her interest in the companies to Tyler for at least that amount. (*Id.*) Otherwise, she wanted to retain her interest in Home Road and Key and Lock. (*Id.*)

{¶ 15} The "book value" about which Fissel testified is pertinent to the transfer of an ownership interest in the two companies under the terms of a "Members' Agreement," which governs relations between owners and restricts transferability of ownership. (*See* Members' Agreements at Plaintiff's Exhibits 2, 4.) For any transfer coming within the

---

[7] By our calculations, 25 percent of the book value is $44,745.06. The 14-cent difference between Jessica's valuation and ours is immaterial.

terms of the Agreement, the companies have the first option to purchase a membership interest at the lower of (1) the price offered by a prospective purchaser or (2) the price set forth in Section 5 of the Agreement. (Members' Agreement at Section 3.01.) In turn, Section 5 provides:

> PURCHASE PRICE. The price of the Company Membership Interests under this Agreement shall be its Fair Market Value. "Fair Market Value" of a share of Company Membership Interests pursuant to this Agreement shall be the Company's book value as determined by the Company's accountant as of the last day of the preceding calendar year, divided by 100, multiplied by the number of membership units being transferred.

(*Id.* at Section 5.)

{¶ 16} In the proceedings below, attorney Barry Rich, who drafted the Members' Agreement, initially suggested that the disposition of Jessica's ownership interest in this case might be governed by the document. (March 28, 2018 Tr. at 92-93.) Later in his testimony, he suggested that a transfer in the context of a divorce might not qualify as either a "voluntary transfer" or an "involuntary transfer" and might not be covered. (*Id.* at 102.) He subsequently was recalled to testify further about the Members' Agreement. He definitively stated that the Agreement did not apply to the trial court's disposition of Jessica's interest in the companies. He noted that the issue of divorce is not specifically mentioned anywhere in the Members' Agreement or a separate Operating Agreement. (Sept. 7, 2018 Tr. at 11.) He also cited Section 9 of the Members' Agreement, which provides: "This Agreement does not restrict transfer by sale, gift or bequest between or

to current Members." (*Id.* at 13.) As a result, Rich opined that the Agreement did not apply to the divorce proceeding and that Home Road and Key and Lock had no first option to acquire Jessica's ownership interest. (*Id.* at 14-15.)

**{¶ 17}** But regardless of whether the transfer restrictions in the Members' Agreement strictly apply here, we believe the "Fair Market Value" found in Section 5 is the most appropriate valuation for present purposes. We reach this conclusion for several reasons. First, as set forth above, the valuation method applied by the trial court produces what we believe is an unreasonable result. Second, Jessica testified that she is agreeable to transferring her ownership interest in the companies to Tyler for "book value" or $44,744.92. For anything less than that, she would rather retain her interest. Jessica's willingness to be bought out for $44,744.92 is some indication of the minimum value she places on what she owns.[8] Third, the book value referenced in the Members' Agreement is an indication of both parties' assessment of the value of Jessica's interest. If it were not, the Members' Agreement presumably would not have adopted that valuation. In finding the book value of $44,744.92 to be the most reasonable value to apply to Jessica's interest, we note too that she is not transferring her interest to a hypothetical prospective purchaser. Rather, she is transferring her interest to Tyler, who already owns 25 percent of the companies and who shares decision-making power solely with his sister under the terms of the companies' Operating Agreement. Because the "purchaser" in the present case is a person who will own 50 percent of the companies and who shares control with only one other person, Jessica's interest reasonably should have more value to him than

---

[8] As an alternative argument on appeal, Jessica urges us to use $44,744.92 as the value of her interest in the two companies. (Appellant's brief at 16.)

to a random person.

**{¶ 18}** Based on the foregoing reasoning, we hold that the trial court abused its discretion in finding Jessica's interest in Home Road and Key and Lock to have a negative market value and in awarding that interest to Tyler without any compensation to her. Such a disposition was not reasonable based on the record before us. Although a trial court in a divorce proceeding should endeavor to disentangle the parties financially when possible, we believe the most appropriate resolution in the present case is for the trial court to give Tyler a choice. He can give Jessica $44,744.92 for her interest in the two companies and have that interest transferred to him. Or he can decline to do so, and she can keep her interest. Although it may be preferable to separate the parties' business affairs, Jessica should not be compelled to give her interest in the companies to Tyler without any compensation, which is what the trial court ordered. If Tyler truly believes Jessica's interest has no current market value, as he argues on appeal, then he can allow her to keep that interest, which she testified has financial value to her. Because Tyler and his sister enjoy decision-making control, Jessica essentially would remain a silent partner. The first assignment of error is sustained.

**{¶ 19}** We turn now to the second, third, and fourth assignments of error. Therein, Jessica challenges the trial court's findings that the minivan, the travel trailer, and the $30,000 down payment for the marital residence were gifts to Tyler from his father. In support of its determination, the trial court found credible and relied upon the testimony Sherman Kapp, Tyler's father. (Doc. #47 at 13, 15-16.) Sherman testified that he made a gift of $30,000 directly to his son for a down-payment on the parties' home. (March 7, 2018 Tr. at 163; March 28, 2018 Tr. at 7.) He denied making that gift to Jessica. (March

7, 2018 Tr. at 163.) He also testified that he purchased the travel trailer with a $6,000 cashier's check and that he gifted the trailer to Tyler, who was the titled owner. (*Id.* at 164-166.) Finally, with regard to the minivan, Sherman testified that it had belonged to his daughter. He paid her $10,000 for it and had her transfer the title to Tyler. His intent was to gift the van to Tyler through his daughter. (*Id.* at 166-167.)

{¶ 20} On appeal, Jessica contends the trial court abused its discretion and applied the wrong standard of proof in finding that the minivan and travel trailer were gifts only to Tyler. Even if the minivan was a gift to Tyler alone, she contends the evidence supports a finding that Tyler in turn gifted it to her. Jessica cites Sherman's testimony that he knew it "would help the family" if he gave the minivan to Tyler. (March 7, 2018 Tr. at 167.) She also cites his knowledge that she would be the primary driver. (March 28, 2018 Tr. at 15-16.) She notes too that Tyler testified that the minivan was not to be his own "separate" vehicle. Instead, it primarily was for Jessica to drive. (July 19, 2018 Tr. at 117.) She additionally contends Tyler testified that he wanted her to have the minivan. (July 30, 2018 Tr. at 9.) As for the travel trailer, Jessica cites Sherman's admission that he bought it for "the whole family" to use. (March 28, 2018 Tr. at 13.) She also cites Tyler's testimony that they both researched and selected the trailer. (July 19, 2018 Tr. at 116.) Finally, she cites Tyler's agreement that his father said "you guys pick out the camper and I'll buy it for you." (*Id.* at 117.) Concerning the standard of proof, Jessica claims the trial court erred in requiring proof by a preponderance of the evidence that the minivan and the travel trailer were gifts only to Tyler. Because the gifts were made during the marriage, Jessica argues that they were presumed to be marital gifts to both parties and that Tyler was required to prove by clear and convincing evidence that they gifts were to him alone.

{¶ 21} With regard to the $30,000 down payment, Jessica argues that the trial court abused its discretion in finding that the money was a gift only to Tyler. She cites Sherman's testimony that the gift was so "that they would not have had to pay PMI[.]" (March 28, 2018 Tr. at 11-12.) She also cites Tyler's testimony that his father knew both of them would own and live in the house. (July 19, 2018 Tr. at 111-112.) Jessica additionally claims Sherman admitted that he did not file a gift-tax return, which she contends supports a finding that the $30,000 was not a gift to Tyler alone. Finally, Jessica argues in the alternative that Tyler gifted her a one-half interest in the $30,000 by virtue of the fact that they both owned the property and lived in the house and the fact that she initially was a co-applicant on the loan until being removed to improve their interest rate.

{¶ 22} Upon review, we find Jessica's arguments to be unpersuasive. With regard to the standard-of-proof issue, the trial court did not identify a particular standard when discussing the minivan or the travel trailer. On these issues, it simply found Sherman Kapp's testimony credible and determined, based upon it, that the minivan and the travel trailer were Tyler's separate property because they were gifts only to him. (Doc. # 47 at 15-16.) When addressing the down payment for the marital home, however, the trial court did find "from a preponderance of the credible evidence, that the $30,000 down payment on the Torrence property was, in fact, a gift from Mr. Kapp's father to him alone and therefore it is Mr. Kapp's separate property." (*Id.* at 13.)

{¶ 23} The trial court erred in applying a preponderance-of-the-evidence standard when determining that the down payment money was a gift to Tyler alone. "Generally, the party claiming that an asset is separate property has the burden of proving the claim by a preponderance of the evidence." *Hall v. Hall*, 2d Dist. Greene No. 2013 CA 15, 2013-

Ohio-3758, ¶ 14, citing *Peck v. Peck*, 96 Ohio App.3d 731, 734, 645 N.E.2d 1300 (12th Dist.1994). But when the property involves a gift made during the marriage, it is presumed to be marital property. Overcoming this presumption requires clear and convincing evidence that the gift was given to only one spouse. *Id.* "Clear and convincing evidence means that degree of proof which will provide in the mind of the trier of fact a firm belief or conviction as to the facts sought to be established." *Id.*

{¶ 24} Although the trial court cited an incorrect standard of proof when considering whether the down-payment money was Tyler's separate property, its error in that regard was harmless.[9] As the trier of fact, the trial court found credible and accepted Sherman Kapp's testimony that the $30,000 down-payment money, the minivan, and the travel trailer were intended to be gifts to Tyler alone. The trial court had discretion to credit this testimony, which satisfied Tyler's burden of proof. Indeed, if Sherman's testimony is found credible and accepted as true, which the trial court did, then all of the property at issue *was* a gift to only Tyler under any standard of proof. The only possible question is whether the trial court abused its discretion in crediting Sherman's testimony. We conclude that it did not.

{¶ 25} In reaching our conclusion, we note that the testimony Jessica cites is not inconsistent with a finding that Sherman gifted the property to only Tyler. The cited

---

[9] We note that a trial court's erroneous application of a preponderance-of-the-evidence standard rather than a clear-and-convincing-evidence standard is subject to harmless-error analysis. *See, e.g., Buszkiewicz v. DiFranco*, 140 Ohio App.3d 126, 131, 746 N.E.2d 712 (8th Dist.); *In re Phillips*, 3d Dist. Marion Nos. 9-96-44, 9-96-45, and 9-96-46, 1997 WL 126835, *2 (March 13, 1997); *Lucarell v. Nationwide Mutual Ins. Co.*, 152 Ohio St.3d 453, 2018-Ohio-15, 97 N.E.3d 458, ¶ 58-60 (recognizing that erroneous application of a preponderance-of-the-evidence standard could be non-prejudicial but declining to make such a finding on the record before it).

testimony suggests that Sherman knew the down-payment money, the minivan, and the travel trailer would benefit the whole family, that Jessica primarily would drive the minivan, and that Tyler and Jessica both would own and live in the house. We see no reason, however, why Sherman could not make gifts to Tyler alone with knowledge that Jessica also would benefit from them. As for Tyler's agreement that his father said "you guys pick out the camper and I'll buy it for you," it is not apparent that the second "you" meant Tyler *and* Jessica. A finding that the second "you" meant Tyler alone is consistent with Sherman's testimony, which the trial court credited. As for Tyler's testimony about wanting Jessica to have the minivan, he merely agreed that for purposes of dividing assets he "had no difficulty in her retaining" it. He did not testify that it was a gift to her or that he should not be compensated for her retaining it, which is what the trial court ordered. As for the down-payment money, Sherman did not admit failing to file a gift-tax return. On the cited pages, he testified that he was "not sure" whether he had filed one. (March 28, 2018 Tr. at 9-10.) Regardless, his failure to file a gift-tax return does not prove that he gave the money to both Tyler and Jessica rather than just Tyler. Sherman's awareness that the down-payment money meant that "they" would not have to pay private mortgage insurance also fails to establish a gift to both parties. Finally, we are unpersuaded by Jessica's argument that the record demonstrates a gift from Tyler to her of the minivan and a one-half interest in the $30,000 down payment. The fact that Jessica benefitted from these things does not mean Tyler gave them to her. The second, third, and fourth assignments of error are overruled.

{¶ 26} In her fifth assignment of error, Jessica challenges the trial court's treatment of Tyler's 401(k) account. She raises three issues. First, she contends the trial court erred

in stating that the total account balance was $11,849.75. Jessica asserts that this was the stipulated marital portion of the account, not the total balance. Second, she argues that the trial court erred in using a coverture fraction computation and deferring payment of her share until Tyler retires or begins drawing from the account. Because the marital portion of the account was stipulated and the value of the account was simply the balance, Jessica claims the trial court should have awarded her one-half of the marital portion to be allocated immediately through a qualified domestic relations order. Third, if deferring distribution until Tyler's retirement was proper, Jessica claims the trial court should have included language in its decision restraining Tyler from unilaterally withdrawing the funds or borrowing against the account.

**{¶ 27}** Upon review, we agree that the trial court misstated the balance in Tyler's 401(k) account and that it abused its discretion in using a coverture fraction computation of value with distribution deferred until Tyler retires or begins drawing benefits. In its decision, the trial court stated that the account had a balance of $11,849.75 as of December 31, 2017. The trial court then found Jessica entitled to "her covertured share of these monies which accrued during the tenure of the parties' marriage plus her covertured share of any gains or losses which accrue until distribution[.] (Doc. # 47 at 17-18.) The trial court made the following specific order regarding valuation and future distribution:

> IT IS FURTHER ORDERED that the Defendant, Jessica Kapp, shall be awarded one-half of the 401K savings plan managed by Principle Financial Services appearing in the name of Tyler Kapp which accrued between April 23, 2011 and September 24, 2018 with the specific amount

to be determined at such time as when the Plaintiff, Tyler Kapp, retires or begins receiving these benefits, with the value of this asset to be determined by computing the ratio of the number of years of employment of Mr. Kapp during the marriage (between April 23, 2011 and September 24, 2018) to the total number of years of his employment, with Ms. Kapp to be awarded one-half of the calculated amount resulting therefrom, with the specific stipulation that Ms. Kapp will also be entitled to her pro-rata share of gains or losses incurred in said account until final distribution.

(*Id.* at 18.)

**{¶ 28}** At trial, however, the parties stipulated to the conclusions in an expert report establishing that the total value of the 401(K) account was $48, 361.00, and the value of the marital portion of Tyler's 401(K) account was $11,849.75 as of December 31, 2017. (July 19, 2018 Tr. at 13-14, citing Exhibit 30.) In light of that stipulation, we see no sound reason for the trial court to engage in a coverture fraction computation to determine the value of Jessica's one-half interest in the marital portion of Tyler's 401(K) account. We also see no sound reasoning process to support deferring distribution of Jessica's one-half interest to her until Tyler's retirement likely many years in the future. "When a trial court decides that a pension or retirement asset shall be paid by deferred distribution, it has created a situation where the parties' affairs are not concluded. The non-employed spouse may be placed in a position where he or she must monitor the fund * * *." *Hoyt v. Hoyt*, 53 Ohio St.3d 177, 182, 559 N.E.2d 1292 (1990). Thus, "when circumstances permit, [trial courts] should strive to resolve the issues between the parties so as to disassociate the parties from one another or at least minimize their economic

partnership." *Id.* At times, however, joint ownership of an account after divorce may be necessary to realize the "optimum value" of the benefit based upon the nature and terms of a plan. In such a case, a "trial court should structure a division which will best preserve the fund and procure the most benefit to each party." *Id.* at 183.

**{¶ 29}** Applying a coverture fraction analysis to determine the value of a spouse's share of a pension benefit, and deferring distribution until the other spouse's retirement, often makes sense in the case of a defined-benefit plan. Under that type of plan, the value of the marital portion of the benefit may increase dramatically as the working spouse advances in age and accrues additional years of service credit. Here, however, Tyler's 401(k) account is a defined-contribution plan. The value of the plan is simply the account balance at any given time. *Hoyt* at 180, fn. 11. Unlike a defined-benefit plan, Tyler's future longevity and years of additional service with his employer will not themselves impact the value of the martial portion of his 401(k) account, which will rise or fall with the underlying investments. Moreover, the parties are in their early thirties. That being so, we see no sound reason to defer Jessica's receipt of her half of the marital portion of the account until Tyler's future retirement. Although we are cognizant of the discretion a trial court enjoys in considering the disposition of retirement benefits, *Hoyt* at 180, we conclude that the trial court acted unreasonably here in not simply awarding Jessica one-half of the stipulated value of the marital portion, which was $11,849.75 as of December 31, 2017, plus or minus any gains or losses that occur prior to the preparation of a qualified domestic relations order promptly allocating Jessica's share to her. Accordingly, the fifth assignment of error is sustained.

**{¶ 30}** In her sixth assignment of error, Jessica maintains that the trial court erred

in refusing to require Tyler or the two self-storage companies to pay her attorney fees. In essence, she accuses Tyler of prolonging the proceedings by giving her unreasonable dissolution proposals, voluntarily agreeing to move out of the marital home then changing his mind, threatening to seek a divorce on the grounds of adultery and actually filing on those grounds, placing a GPS tracking device on her vehicle and a hidden camera in the garage to help him prove adultery, requiring extensive evidence at trial regarding adultery, and changing his position on the value of the self-storage businesses. Jessica also argues that during trial the two self-storage businesses, as parties to the case, changed their own position regarding a proper valuation. In light of these facts, Jessica contends the trial court abused its discretion in failing to require Tyler or the self-storage businesses to pay some or all of her attorney fees.

{¶ 31} Upon review we see no abuse of discretion in the trial court's failure to make an attorney-fee award in favor of Jessica. Contrary to her argument on appeal, the record fails to persuade us that Tyler inappropriately litigated the case in a way that would warrant such an award. Tyler was free to give Jessica any dissolution proposal he desired, and she was free to reject it. Although he initially planned to move out of the marital residence, he had no legal obligation to do so. Tyler also acted within his rights by pursuing a divorce on the statutorily-recognized ground of adultery and by proving that charge at trial. The record indicates to us that both parties played "hard ball" in the course of what at times was a contentious proceeding. At trial, Tyler and Jessica both frequently attempted to portray the other party in the worst possible light. As for the valuation of the self-storage businesses, that issue was a complicated one, requiring the presentation of expert testimony, review of numerous documents, and consideration of various potential

valuation methodologies. We see nothing to suggest that Tyler or the self-storage companies intentionally or unnecessarily prolonged the proceedings in a way that might justify an attorney-fee award. Finally, we note that Tyler's own attorney fees and litigation-related expenses roughly equaled or exceeded Jessica's and that the trial court found the parties to have relatively equal assets and incomes. (September 24, 2018 Tr. at 95; Doc. # 47 at 25.) Under these circumstances, we do not find that the trial court's failure to award Jessica attorney fees was unreasonable, arbitrary, or unconscionable. The sixth assignment of error is overruled.

{¶ 32} In her seventh assignment of error, Jessica contends the trial court erred in ordering shared parenting. She notes that an important consideration in a shared-parenting arrangement is the parties' ability to cooperate and to communicate with regard to the children. She then cites trial testimony to suggest that during the marriage she made most or all important decisions regarding the children and that Tyler was non-collaborative and often refused to communicate. She also cite testimony about various conflicts that existed during the divorce proceeding, about Tyler's behavior, and about the parties' continued failure to communicate. In light of this evidence, Jessica argues that shared-parenting is unsupported by the record.

{¶ 33} Upon review, we find Jessica's assignment of error to be unpersuasive. Having reviewed the record, we see no abuse of discretion in the trial court's decision to implement shared parenting. The trial court's ruling makes clear that it considered the proper factors in relation to the evidence before it and explained its decision in detail. (Doc. # 47 at 2-8.) Although Jessica disagrees with the trial court's allocation of parental rights, its decision was not unreasonable, arbitrary, or unconscionable. While recognizing

that communication had broken down as the marriage failed and during the divorce proceedings, the trial court believed that after the litigation ended the parties would be able to work together and make joint decisions regarding the children, which the trial court found was in the best interest of the children. As the trier of fact, the trial court had discretion to make this determination, which was consistent with the guardian ad litem's recommendation of shared parenting.[10] The seventh assignment of error is overruled.

{¶ 34} In her eighth assignment of error, Jessica claims the trial court erred in failing to award her child support. She first points out the trial court's failure to complete a child-support computation worksheet prior to denying her request for child support. She then argues that she would have been entitled to child support if the trial court had taken into account Tyler's share of the self-storage business income and included it in his gross income on a child-support computation worksheet. She also contends the trial court should have credited her testimony that she pays for most of the children's expenses and her belief that Tyler will not help with those expenses in the future.

{¶ 35} With regard to the self-storage business income, Jessica cites R.C. 3119.01(B)(11), which provides that gross income, for purposes of child support, includes "potential cash flow from any source." Jessica notes that the purpose of including potential cash flow in a child-support computation is "to prevent a parent from avoiding child support obligations by shifting present income to a cash flow expected to be enjoyed at some future date, when the children have become emancipated." *Sizemore v. Sizemore*, 2d Dist. Montgomery No. 13673, 1994 WL 558917, *3 (Oct. 14, 1994).

---

[10] At trial, Jessica herself testified that she did not oppose shared parenting before changing her mind roughly five months later and indicating that she wished to be designated the sole custodian. (March 28, 2018 Tr. at 164; August 17, 2018 Tr. at 43.)

{¶ 36} In its decision declining to award Jessica child support, the trial court rejected her argument that additional income should be imputed to Tyler to account for his interest in the self-storage business. The trial court also noted that it was adopting a shared-parenting plan that would result in relatively equal parenting time with the parties sharing expenses. The trial court additionally recognized that the parties had nearly identical incomes from their employment. It reasoned:

At the hearing herein, Ms. Kapp requested that Mr. Kapp be required to pay her child support for the minor children. Mr. Kapp, on the other hand, proposes that neither of the parties pay child support to the other; that each provide solely for the support of the children while they are in their care; that the parties are equally responsible for all education fees, extracurricular fees and other activity expenses. This is set forth in his proposed Shared Parenting Plan.

The Court finds, from the totality of the credible evidence, that Mr. Kapp's gross annual income from his employment at Kapp Construction Company is approximately $37,960.00. Ms. Kapp earns approximately $40,000 from her employment at Kone Kranes. Essentially, Ms. Kapp is asking [the] Court to impute an additional $47,000 in income to Mr. Kapp which she claims represents his interest in the two separate Store and Lock facilities. This Court disagrees that Mr. Kapp has, at his disposal, additional income resulting from any interest which he might have in the Store and Lock facilities.

The Court further finds that the parties hereto not only have relatively

equal incomes, it is anticipated that they will have approximately equal parenting time with the children. Therefore, it is not equitable or in the children's best interest to obligate either of the parties to pay child support to the other.

(Doc. # 47 at 9-10.)

{¶ 37} Having reviewed the record, we see no error in the trial court's failure to add Tyler's share of the self-storage business income to his gross income for child-support purposes. The record contains uncontroverted evidence that Tyler's father, Sherman Kapp, provided up-front capital and personally guaranteed the financing for his children and their spouses to purchase the two self-storage facilities that they operated through LLCs. Various conditions imposed by Sherman became part of the entities' governing documents. Those conditions included a prohibition on distributions of cash flow to any members of the LLCs (i.e., Sherman's children and their spouses), other than amounts necessary to pay taxes, as long as Sherman remained a guarantor of any loans. At the time of trial, Sherman remained the guarantor of roughly $1,000,000 of promissory notes to a bank for financing of the businesses. At trial, Jessica acknowledged that she and Tyler never received any distributions from the self-storage businesses during their marriage. (Sept. 20, 2018 Tr. at 38-43.) She also acknowledged that the governing documents prohibited distributions other than to reimburse members for tax liability. (*Id.*)

{¶ 38} In light of the foregoing evidence, the trial court reasonably could have concluded that the self-storage business income was not "potential cash flow" to Tyler within the meaning of R.C. 3119.01(B)(11). It was not potential cash flow because Tyler was expressly prohibited from accessing it as a result of conditions that his father imposed

during the parties' marriage. In contrast to the case law cited in Jessica' appellate brief, the trial court also reasonably could have concluded that Tyler did not "shift" present income to future cash flow to avoid a child-support obligation. As Jessica herself acknowledged, the business income was unavailable to the parties during their marriage, and it remained unavailable to Tyler after their divorce. In her reply brief, Jessica suggests that Sherman could waive the prohibition on distributions. But the record contains no evidence to suggest that he intends to waive the prohibition, that he ever has done so before, or that he has any obligation to do so. Therefore, on this record, we see no abuse of discretion in the trial court's failure to include Tyler's share of the business income in his gross income for child-support purposes.

{¶ 39} Jessica also cites evidence that the purpose of the self-storage businesses was to provide a source of income to pay college expenses for Sherman Kapp's grandchildren when they are older. Therefore, Jessica suggests that Tyler should be obligated to use the business income for the children's future college education if the money is not included in child-support computations. We note, however, that while Sherman Kapp desired and intended for the business income ultimately to be used to educate his grandchildren, the governing business documents impose no such restriction. Regardless, whatever the income might be used for in the future does not alter the fact that it currently is not "potential cash flow" to Tyler because no distributions are allowed until roughly $1,000,000 in debt is extinguished.

{¶ 40} Jessica also suggests in passing that Tyler benefits from additional "income," beyond his paycheck, in the form of a company car, gas paid for by his employer, and a free cell phone with service provided by his employer. (Appellant's brief

at 35.) Insofar as Jessica might be suggesting that these benefits entitle her to child support, we note that her actual income, by her own admission, was $40,800 annually, not the $40,000 figure the trial court used. (July 30, 2018 Tr. at 155.) Although the trial court found that the parties had "relatively equal" incomes, Tyler's income from his paychecks was $37,960 annually. The company-paid benefits Tyler receives reasonably might be deemed to equalize the nearly $3,000 in additional income that Jessica earns.

{¶ 41} Finally, we turn to Jessica's observation about the trial court's failure to complete a child-support computation worksheet. It is not clear to us from her argument whether she is raising this issue as a stand-alone basis for reversing the trial court's judgment. Jessica appears to be arguing that if the trial court had completed the worksheet and had included self-storage business income in Tyler's gross income, then she would be entitled to child support. This argument fails because we have determined above that the trial court reasonably declined to consider the self-storage business income in connection with child support. But even if we assume arguendo that the trial court erred in failing to complete a worksheet and that Jessica is raising that discreet issue on appeal, we see no basis for reversal. In the proceedings below, Jessica provided the trial court with her own child-support worksheet calculations, which depended on Tyler having additional income of $47,727 from the self-storage business. (Exhibits UU and VV.) Once again, we see no error in the trial court excluding that income.

{¶ 42} In short, the record reflects that the parties had roughly equal incomes and that they had nearly equal shared-parenting time. Each parent was responsible for providing for the children's expenses while in that parent's care, and the trial court ordered the parties to split equally all educational and extracurricular fees and expenses. Without

the imputation of additional income to Tyler from the self-storage businesses, we fail to see how Jessica was prejudiced by the trial court's failure to complete its own child-support computation worksheet.[11] *See, e.g., O'Malley v. O'Malley*, 8th Dist. Cuyahoga No. 98708, 2013-Ohio-5238, ¶ 85 (recognizing that a trial court's failure to complete a child-support computation worksheet is subject to harmless-error analysis). The eighth assignment of error is overruled.

{¶ 43} Having sustained Jessica's first and fifth assignments of error, we reverse the trial court's judgment with respect to its disposition of her interest in the two self-storage businesses and of Tyler's 401(k) account. On remand, the trial court shall give Tyler a choice. He can give Jessica $44,744.92 for her interest in the two companies and have that interest transferred to him, or she can keep her interest. The trial court also shall award Jessica one-half of the stipulated value of the marital portion of the 401(k) account, which was a tax-deferred $11,849.75 as of December 31, 2017, plus or minus any gains or losses that occur prior to transfer of her tax-deferred portion of the account to her or to the preparation of a qualified domestic relations order allocating Jessica's share to her. In all other respects, the trial court's judgment is affirmed.

. . . . . . . . . . . . .

FROELICH, J. and TUCKER, J., concur.

---

[11] On appeal, Jessica acknowledges that there would be no abuse of discretion in the trial court's failure to award her child support if she had retained her interest in both LLCs or if the trial court had ordered Tyler to compensate her for them. (Appellant's brief at 35-36.) This is precisely what we ordered in our resolution of Jessica's first assignment of error above. As a practical matter, then, it appears that her eighth assignment of error is moot. We nevertheless have addressed her arguments in the interest of completeness.

Copies sent to:

Stacey R. Pavlatos
Valerie Juergens Wilt
Hon. Thomas J. Capper